STATE OF NEBRASKA, APPELLEE, V. FLOYD L. DERRY, APPELLANT.

534 N.W.2d 302

Filed June 23, 1995. No. S-94-1178.

David T. Schroeder, of Kelly & Schroeder, and R. Bradley Dawson, of Clough, Dawson & Piccolo, for appellant.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, and CONNOLLY, JJ., and HICKMAN, D.J., Retired.

CONNOLLY, J.

Floyd Derry was convicted of murder in the second degree by a jury in the district court for Deuel County for the November 4, 1993, killing of his wife, Veronica Derry (the victim). Derry appeals his conviction, alleging that certain jury instructions given by the trial court were erroneous, that there was insufficient evidence to support the conviction, and that his

sentence was excessive. For the reasons stated herein, we affirm.

## I. FACTUAL BACKGROUND

### 1. EVENTS PRIOR TO NOVEMBER 4, 1993

Derry and the victim were married March 30, 1959. The record reflects that the marriage was troubled from the beginning. Derry testified that in 1981, he was diagnosed with multiple sclerosis. In 1984, Derry began walking with the aid of crutches. Sometime during the mid–1980's, Derry and the victim started arguing a lot, and the couple's marriage began to deteriorate. In January 1991, the fighting got so bad that Derry began sleeping in a separate bedroom.

On September 21, 1993, the victim told Derry that she wanted a divorce. Two days later, on September 23, Derry received a "Protection Order" issued by the district court for Deuel County, ordering him not to disturb the victim. Derry contacted an attorney and, pursuant to the attorney's instructions, removed his clothing and personal belongings from the family home. Thereafter, Derry showered at a farmstead that he owned 10 miles east of Chappell, Nebraska, near Interstate 80, and slept at his father's home in Chappell.

### 2. EVENTS ON NOVEMBER 4, 1993

After he moved out of the family home, Derry regularly spoke with the victim on the telephone to read her mail to her and to determine if the victim wanted any of the mail brought to her. Sometime during the first few days of November 1993, the victim called Derry and told him that she had been dating another man for approximately 5 years and that she was leaving to be with the other man on Thursday, November 4. Derry testified that during the time preceding that phone call, he had wanted to remain married to the victim.

Derry finished work at approximately 6 p.m. on Thursday, November 4; showered and changed his clothes at his farmstead; and then went into Chappell to eat dinner with his father and to sort the mail. At approximately 8 p.m., Derry left Chappell and drove out to the family home where the victim still resided. Derry testified that he went to see the victim

because he wanted to talk her into staying with him. Derry waited near the house in his pickup until the victim returned and then drove his pickup to just east of the house and parked. Derry got out of the pickup and shut the door. The victim approached him and knocked him down by hitting him in the chest with a large purse.

Derry testified that he got back to his feet and began trying to talk to the victim about getting back together. The victim continued to hit Derry with the purse, eventually knocking him off his feet a second time. Derry testified that as he began crawling back to the pickup the victim stopped hitting him, so he got up and walked to the pickup. Upon reaching the pickup, Derry opened a toolbox and grabbed a crescent wrench. He told the victim, "Now damn it, you hit me again and I am going to hit you back." Derry testified that the victim swung the purse at him again and that he hit her in the ear with the wrench. Derry claimed that he meant to tap the victim on the shoulder with the wrench, but that when he accidentally hit her ear she started bleeding. The wrench flew out of Derry's hand and landed behind the victim.

After being struck with the wrench, the victim dropped her purse and headed for the garage beside the house. Derry picked up the wrench and began to follow her. The victim stopped at the garage and started talking very fast, accusing Derry of following her and spying on her. Derry testified that he denied spying on the victim and that he told her to shut up so they could talk. The victim began to walk toward the back of the house, and Derry followed. Derry testified that he attempted to tap the victim on the shoulder with the wrench, but the wrench flew out of his hand and landed on the ground in front of the victim. The victim dove to the ground and grabbed the wrench. The victim then wrapped her legs around Derry's legs and brought him to the ground beside her. Derry estimated that they were struggling on the ground for approximately 30 minutes.

While they were lying on the ground, Derry testified that the victim kept trying to hit him with the wrench. Derry blocked the victim's attempts to strike him with the wrench by putting his hand on the top end of the wrench. Derry testified that the victim told Derry that he was going to run out of energy and

become weak. Derry, fearing that the victim was right, took his left hand off the wrench and slugged the victim three or four times. Derry felt the victim relax her legs enough for him to twist free, so he pulled loose and grabbed the wrench. In a tape-recorded interview conducted with Sgt. Gary Renner of the Nebraska State Patrol soon after Derry's arrest, Derry gave the following account of events after he gained control of the wrench:

FD [Derry]: . . . I grabbed that crescent and I twisted and I got it away from her. And she's trying to get it back on, so I hit her, and hit her, and hit her.

GR [Sergeant Renner]: Hmm. Have any idea how many times you hit her?

FD: I don't think I counted.

GR: No but a–a lot though huh?

FD: She kept talking to me. I couldn't believe she's alive, I hit her and I knew she's dead. I mean I hit her really hard and, when on the ground I used both hands on the wrench. And, and I hit her and she was talking to me.

GR: Hmm.

FD: So I had to hit her again. And, you know what she did, she still's talking. And that's, I couldn't believe that I was going to hit her again. Anyway the last time I hit her, I hit her in, in the face and then, and then her face broke.

GR: Where was you hittin' her the other times?

FD: I don—, well I remember, I remember the last time, I was, she just kept talking, I mean, you couldn't get her to shut up. I, some where in the head, I don't know where.

Later in the interview, Sergeant Renner asked Derry why he chased the victim into the backyard. Derry responded:

FD: Well what, what's gonna happen to me if I, I've hit her with the wrench.

GR: Um hmm.

FD: . . . If I would hit her with a wrench, and she went to town and told I hit her with the wrench, or I could have killed her, I wouldn't have got punished any different. It'd been the same punishment, I was trying to kill her.

.

. . . .

FD: And then, (unintelligible) I was running, an–and I hit her and then she tangled up her legs around mine. And we were on the ground there for, twenty thirty minutes. She just, had her mouth going all the time and I knew there was no talk. I had to ah, kill her.

Dr. Alvin Armstrong, called by the State as an expert in forensic pathology, conducted an autopsy on the victim and determined that the victim received approximately 39 blows to the head, resulting in her death.

After he killed the victim, Derry attempted to carry or pull her body to his pickup. Finding that he did not have enough strength to move her that far, Derry rolled the victim's body into the bucket of a loader and used the loader to dump her into the bed of his pickup. Derry transported the victim's body to his farmstead near Interstate 80 and dug a shallow hole with another loader. He backed up his pickup to the hole and rolled the victim's body into it. Derry also threw his bloody coveralls and the victim's coat and purse into the hole. Derry covered the hole, went into his house, washed his clothes, and left. Derry estimated that he returned to his father's home in Chappell at 3 or 4 a.m. on November 5, 1993. He eventually got rid of the murder weapon by throwing it into a ditch.

### 3. EVENTS LEADING TO DERRY'S ARREST

On Monday, November 8, 1993, police discovered and excavated the victim's body. Apparently, Derry drove by the farmstead while the police were digging. Figuring that police had found the victim's body, Derry drove away in his white Ford Fiesta and headed west.

Officer Steven Townsend of the Wyoming Highway Patrol received a dispatch concerning Derry's Ford Fiesta. At approximately 10 p.m. on November 8, Officer Townsend spotted Derry's vehicle and attempted to initiate a stop. Derry stopped briefly, then led police on a high–speed chase which ended when Derry crashed his car at Warren Air Force Base. Officer Townsend arrested Derry at that point.

### 4. TRIAL

Derry was charged with first degree murder and use of a

deadly weapon to commit a felony. At his jury trial, Derry submitted into evidence the following stipulation:

> On November 4, 1993, at approximately 9:30 p.m., Floyd L. Derry killed Veronica C. Derry upon a sudden quarrel at their residence approximately one-half mile east of Chappell in Deuel County, Nebraska. Veronica C. Derry died as a result of blows to her head from a 15 to 18 inch crescent wrench. After Veronica C. Derry's death, Floyd L. Derry moved her body from the location of her death to a farmstead approximately 10 miles east of Chappell and buried her body.

After hearing all the evidence, the jury convicted Derry of murder in the second degree. The district court overruled Derry's motion for judgment notwithstanding the verdict or, in the alternative, for new trial. This appeal followed.

## II. ASSIGNMENTS OF ERROR

Derry contends that the district court erred in (1) erroneously instructing the jury and not giving Derry's proposed jury instruction regarding the definition of "sudden quarrel," (2) erroneously instructing the jury and not giving Derry's proposed jury instruction regarding the definition of "reasonable doubt," (3) erroneously instructing the jury and not giving Derry's proposed jury instruction regarding the material elements for the crime of manslaughter, (4) failing to find that the evidence was insufficient to support a conviction of second degree murder, and (5) imposing an excessive and indeterminate sentence.

## III. STANDARD OF REVIEW

In an appeal based on the claim of an erroneous instruction, the appellant has the burden to show that the questioned instruction was prejudicial to or otherwise adversely affected a substantial right of the appellant. *State v. McHenry*, 247 Neb. 167, 525 N.W.2d 620 (1995); *State v. Flye*, 245 Neb. 495, 513 N.W.2d 526 (1994); *State v. Gatson*, 244 Neb. 231, 505 N.W.2d 696 (1993).

On a claim of insufficiency of the evidence, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. *State v. One*

*1985 Mercedes 190D Automobile*, 247 Neb. 335, 526 N.W.2d 657 (1995); *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994).

A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Groff*, 247 Neb. 586, 529 N.W.2d 50 (1995); *State v. Campbell*, 247 Neb. 517, 527 N.W.2d 868 (1995); *State v. Secret*, 246 Neb. 1002, 524 N.W.2d 551 (1994).

## IV. ANALYSIS

### 1. JURY INSTRUCTIONS

Derry argues that the district court erroneously defined "sudden quarrel," "reasonable doubt," and the material elements for the crime of manslaughter and contends that the district court erred in refusing to give Derry's proposed instructions defining those terms.

#### (a) Definition of "Sudden Quarrel"

The district court administered the following jury instruction defining "sudden quarrel": " 'SUDDEN QUARREL' the phrase 'sudden quarrel' does not necessarily mean an exchange of angry words or an altercation contemporaneous with an unlawful killing and does not require a physical struggle or other combative corporal contact between the parties."

Derry contends that the jury instruction administered by the district court erroneously defined "sudden quarrel." In his proposed jury instruction, Derry asked the district court to define "sudden quarrel" as follows:

A sudden quarrel is a legally recognized and sufficient provocation which causes a person to lose normal self control.

The phrase "sudden quarrel" does not necessarily mean an exchange of angry words or an altercation contemporaneous with an unlawful killing and does not require a physical struggle or other combative corporal contact between the parties.

In considering manslaughter, you should consider: whether Mr. Derry acted under the impulse of a sudden quarrel which clouded his reason and prevented rational

action; whether a sudden quarrel excited Mr. Derry and obscured or disturbed his power of reason to the extent that he acted rashly, without due deliberation and reflection, rather than from judgment; whether, under all the facts and circumstances as disclosed by the evidence, a reasonable time had elapsed from the time of the sudden quarrel to the time of the act for passion to subside and reason to resume control of his mind; and whether the suspension of reason, if shown to exist, arising from the sudden quarrel, continued from the time of the quarrel until the very instant of the act.

If Mr. Derry killed Veronica C. Derry upon a sudden quarrel, you should find him guilty of manslaughter.

Assuming, without deciding, that Derry is correct in arguing that the district court's definition of "sudden quarrel" was erroneous, we nevertheless hold that the allegedly erroneous jury instruction did not constitute prejudicial error. To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Trackwell*, 244 Neb. 925, 509 N.W.2d 638 (1994); *State v. Myers*, 244 Neb. 905, 510 N.W.2d 58 (1994). Before an error in the giving of instructions can be considered as a ground for reversal of a conviction, it must be considered prejudicial to the rights of the defendant. *State v. Jones*, 245 Neb. 821, 515 N.W.2d 654 (1994).

The district court in the case at bar properly administered a "step" instruction, wherein it instructed the jury to consider the crime of manslaughter only if they found that the State did not prove that Derry was guilty of second degree murder. In *State v. Pribil*, 224 Neb. 28, 395 N.W.2d 543 (1986), we held that this court will presume that " 'the jury followed the court's instruction and did not consider any of the purported lesser–included offenses after the defendant was found guilty of the primary charge against him.' " *Id*. at 33, 395 N.W.2d at 547–48 (quoting *State v. Murphrey*, 220 Neb. 699, 371 N.W.2d 702 (1985)).

The jury found Derry guilty of second degree murder. Under the step instruction administered by the district court, the jury never reached the question of whether Derry committed the crime of manslaughter. Pursuant to *Pribil*, we assume that the jury obeyed the district court's instructions. Thus, we find that the jury never had the opportunity to apply the district court's definition of "sudden quarrel." Since the jury never reached the question of whether Derry was guilty of manslaughter, he could not have been prejudiced by the erroneous instruction administered by the district court. See *State v. Jones, supra.*

### (b) Definition of "Reasonable Doubt"

The district court administered the same jury instruction defining "reasonable doubt" that has been upheld by both this court and the U.S. Supreme Court. *Victor v. Nebraska*, ____ U.S. ____, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994); *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993), *cert. denied* 114 S. Ct. 113, 126 L. Ed. 2d 78. Derry proposed an alternative definition of "reasonable doubt" at trial, which he urges this court to adopt, at least prospectively, as the proper definition. Derry's arguments are not compelling, and we find that this assignment of error is without merit.

### (c) Elements of Manslaughter

Derry contends that the district court erroneously instructed the jury regarding the elements of the crime of manslaughter and argues that the court erred in refusing to use Derry's proposed instruction regarding the same. This assignment of error is without merit because even if the district court erroneously instructed the jury regarding the elements of manslaughter, Derry could not have been prejudiced by the error. Under the step instruction administered by the district court, the jury never reached the question of whether Derry committed the crime of manslaughter after it determined that he committed second degree murder. See *State v. Jones, supra.* Accord, *State v. Pribil, supra*; *State v. Murphrey, supra.*

### 2. SUFFICIENCY OF EVIDENCE

Derry contends that none of the evidence adduced at trial supported a conviction of second degree murder. A verdict in a

criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. Moreover, on such a claim, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994); *State v. Cook*, 244 Neb. 751, 509 N.W.2d 200 (1993); *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993).

Derry argues that, in effect, he testified that he committed manslaughter and that the State offered no substantial evidence to the contrary. We disagree. The State offered into evidence Derry's tape–recorded confession, wherein Derry stated that he felt that he might as well kill the victim rather than let her go to report his violation of her protection order. Derry stated his belief that he would be subjected to the same punishment in either circumstance. Additionally, Derry told Sergeant Renner that he had to kill the victim because she talked constantly and because he knew that he and the victim would not be able to have a discussion. From this evidence, the jury had sufficient grounds to convict Derry of second degree murder.

### 3. SENTENCES

In his final assignment of error, Derry challenged the sentence imposed by the district court, contending that the sentence was excessive and that the district court did not have the authority to impose an indeterminate sentence. The district court sentenced Derry to 40 years to life in prison for his second degree murder conviction and to 8 to 18 years in prison for his use of a weapon to commit a felony conviction, sentences to run consecutively. Both sentences are within the statutory limits established by the Legislature. Neb. Rev. Stat. §§ 28–105, 28–1205, and 28–304(2) (Reissue 1989).

### (a) Excessive Sentence

A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Groff*, 247 Neb. 586, 529 N.W.2d 50 (1995); *State v. Campbell*, 247 Neb. 517, 527 N.W.2d 868 (1995); *State v. Secret*, 246 Neb. 1002, 524 N.W.2d 551 (1994). An abuse of discretion takes place when the sentencing court's reasons or

rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result. *State v. Wood*, 245 Neb. 63, 511 N.W.2d 90 (1994); *State v. Lowe*, 244 Neb. 173, 505 N.W.2d 662 (1993). Derry contends that we should be shocked that he received a sentence whereby he has no expectation of living long enough to be released on parole. Derry claims that the district court abused its discretion in failing to consider his life expectancy in passing sentence.

In imposing a sentence, a sentencing judge should consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Lowe, supra*; *State v. Ellen*, 243 Neb. 522, 500 N.W.2d 818 (1993). In the case at bar, Derry had no past criminal record, and judging from psychological reports regarding his age, mentality, and experience, he might not pose a threat to society. However, those potentially mitigating factors were counterbalanced by the brutality of the offense, the thought process whereby Derry decided to kill the victim, and his attempts to conceal the commission of the crime, all of which evidenced a blatant disregard for human life. The sentence imposed by the district court was not excessive.

### (b) Indeterminate Sentence

As support for his argument that the district court improperly imposed an indeterminate sentence for the second degree murder conviction, Derry cites *State v. Ward*, 226 Neb. 809, 415 N.W.2d 151 (1987), wherein this court held that under §§ 28-105 and 28-304(2) (Reissue 1985), trial courts were not authorized to sentence one convicted of second degree murder to an indeterminate sentence. However, subsequent to our decision in *Ward*, the Legislature enacted 1993 Neb. Laws, L.B. 529, which went into effect September 9, 1993. L.B. 529, as reflected by Neb. Rev. Stat. § 29-2204 (Supp. 1993), provided:

(1) Except as provided in subsection (4) of this section and except when a term of life is required by law, in imposing an indeterminate sentence upon an offender, the court shall:

(a) Fix the minimum and maximum limits of the sentence to be served within the limits provided by law, except that when a maximum limit of life is imposed by the court for a Class IB felony, the minimum limit may be any term of years not less than the statutory mandatory minimum.

## V. CONCLUSION

L.B. 529 went into effect prior to the commission of the crime of which Derry was convicted and is therefore applicable to this case. See *State v. Secret*, 246 Neb. 1002, 524 N.W.2d 551 (1994). Section 28–304(2) (Reissue 1989) defines murder in the second degree as a Class IB felony. The penalty authorized by § 28–105 (Reissue 1989) for such a felony is a minimum of 10 years' imprisonment and a maximum of life imprisonment. We hold that the sentence imposed by the district court for the second degree murder conviction—40 years to life in prison—was authorized under § 29–2204.

AFFIRMED