STATE OF NEBRASKA, APPELLEE, V. SHERLINE R. WOODS, APPELLANT.

542 N.W.2d 410

Filed January 26, 1996.   No. S-92-1095.

Thomas M. Kenney, Douglas County Public Defender, and Kelly S. Breen for appellant.

Don Stenberg, Attorney General, Jay C. Hinsley, and, on brief, Delores Coe–Barbee for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, and GERRARD, JJ., and STEINKE, D.J., and NORTON, D.J., Retired.

PER CURIAM.

The defendant, Sherline R. Woods, was convicted by a jury of manslaughter and use of a knife to commit a felony. Woods was sentenced to 5 to 10 years' imprisonment for the manslaughter conviction and a consecutive sentence of 2 to 4 years' imprisonment for the conviction of use of a knife to commit a felony. She appealed to the Nebraska Court of Appeals.

The Court of Appeals held that Woods' failure to give a taped statement had no probative value, that the prosecutor had no right to ask the investigating officer whether Woods had refused to give a tape-recorded statement, and that the trial court erred in allowing the prosecution to ask this question. However, the Court of Appeals further found that this error was harmless because the jury heard evidence that Woods provided more than one version of the events on the night she was arrested,

including her admission that she held the knife that killed the victim. The Court of Appeals therefore held that the fact that it was elicited at trial that Woods refused to give a tape-recorded statement did not materially influence the outcome of the jury's verdict.

The Court of Appeals also determined that the trial court's instruction to the jury concerning intoxication was not prejudicial or did not otherwise adversely affect Woods' right of asserting a claim of self-defense.

The Court of Appeals affirmed the judgment of the trial court. *State v. Woods*, 94 NCA No. 8, case No. A-92-1095 (not designated for permanent publication). We reverse the decision of the Court of Appeals and remand this cause of action to the district court for a new trial.

## BACKGROUND

Woods and the deceased, Cheryl Culliver, were involved in a lesbian relationship. During December 1991, Culliver occasionally lived with Woods. Woods testified that she carried a knife for protection and that she had it with her when she went to work on December 20, 1991, at 6 a.m. She called Culliver in the afternoon and told her that she would be late because she was going out with some coworkers.

Woods returned to her apartment after 1 a.m. and found Culliver and a man in the kitchen area smoking crack cocaine. She became upset and asked the man and Culliver to leave. Woods and Culliver continued to talk after the man left. Woods asked Culliver three or four times to leave the apartment. When Culliver refused to leave, Woods called her mother and then called a neighbor, Denise Coleman, for help in getting Culliver to leave. When Coleman arrived, Culliver had pinned Woods on the floor and was "head-butting" her. Eventually, Culliver let Woods up, and Woods pushed Culliver off.

In Coleman's presence, Woods again asked Culliver to leave. Culliver again refused to leave and began pushing and head-butting Woods. Coleman described Culliver as intoxicated and very aggressive. She said that the left side of Woods' face was beginning to swell from the head-butting.

At some point, Woods went into the kitchen, got a knife

which was on top of the refrigerator, and walked out of the kitchen, holding the knife to attempt to scare Culliver into leaving. Coleman testified that Woods never held the knife in a menacing or threatening manner or pointed the knife at Culliver when Woods asked her to leave. Woods then tried to persuade Coleman to assist Woods in talking Culliver into leaving. Coleman continued to attempt to get Culliver to leave and questioned both Woods and Culliver, "Why are y'all acting like this?" Woods responded, "I'm not, I'm trying to get her to leave." Woods stated that she thought Culliver was crazy. She stated that when she picked up the knife, it did not seem to improve the situation with Culliver. In fact, Woods said, Culliver got worse to the point that she thought Culliver was going to also do something to the neighbor, Coleman. Woods laid the knife on a mattress and reached for the telephone to call the police. Culliver then ran toward Woods to stop her from making the call. Woods threw down the phone, grabbed the knife, and told Culliver to get out. Culliver continued moving toward Woods and said, "What are you going to do, are you going to kill me?" Woods kept moving back until she did not have any more room.

Culliver and Woods began struggling, and Woods ended up with her back to the wall of the apartment. Culliver's hand was on top of Woods' hand which was on the knife. Woods said that Culliver leaned toward her and that as Woods pushed Culliver away, Woods pulled the knife out of Culliver.

Coleman said the knife then went up in the air. She went to Woods and Culliver, took their arms and pushed them against the wall, and used her hips to push the women away from the wall. The knife fell, and Coleman picked it up and threw it in the kitchen sink. When she returned from the kitchen, Woods and Culliver were still struggling. Coleman noticed blood on Culliver's shirt and said, "Damn, Sherline, she's cut." Woods and Culliver quit struggling, and Woods pushed Culliver away and tore her shirt open to see the wound. Woods then laid Culliver down on the mattress.

The 911 emergency dispatcher testified that he received a call reporting that a person had been cut. The caller stated that the perpetrator had left. At the scene, Woods told Officer Donald

Stephens that she had witnessed the stabbing and that it was done by a black male named "Clyde." As Woods was being transported to police headquarters, she said that Culliver had been smoking crack cocaine with a male and that in the process of an argument, the male picked up the knife and stabbed Culliver.

At police headquarters, Officer James Wilson told Woods that Culliver was dead. After Wilson administered the *Miranda* warnings to Woods, Woods told him that she got off work at 3 p.m. and called Culliver to tell her she would not be home for a while because she was going out with some friends. She went home about 6 p.m. and then left again. When she returned at about 1 a.m., she found a man named "Albert" smoking crack cocaine with Culliver. Woods became upset and began to argue with Culliver and asked her to leave. Woods said that she got a knife from the kitchen and that during the argument, Culliver lunged at the knife, causing the stab wound.

A pathologist, Blaine Roffman, testified that the stab wound in the left chest was approximately 16 millimeters wide and approximately 6 inches deep. The wound penetrated the chest at approximately the fifth rib, entering the pericardial sac in the top surface of the left part of the heart. The stab wound was the only significant finding which could have resulted in death. He said the knife entered the body straight, like an arrow, with no downward motion. He stated that in general, if a stab wound enters the heart and the knife is taken out, blood will fill the pericardial sac in 3 minutes, causing the heart to stop. In the next 3 to 5 minutes, resuscitation can occur before the victim is brain–dead. He opined that a person could still engage in physical activity for a brief time after sustaining this type of injury. While a significant degree of force is necessary for a knife to penetrate the rib, the force could be the result of a person thrusting the knife or a person falling on it. Roffman said blood tests showed Culliver's blood alcohol level was .242 and that she had a cocaine level of 69 nanograms per milliliter.

During the jury trial, the prosecutor called Officer Wilson to testify about Woods' confession. Based on the following questions by the prosecutor and the answers by Officer Wilson, Woods moved for a mistrial. The court overruled that motion.

The testimony was as follows:

[Prosecutor:] After you got the statement from her, is it your procedure, as it was in the case of Denise Coleman, to ask for a taped statement?

[Officer Wilson:] Yes, sir.

[Prosecutor:] And did you do that in this case?

[Defense counsel]: Your Honor, I object. May we approach the bench?

(A discussion was held in low tones at the bench.)

[Prosecutor]: Now, what?

[Defense counsel]: Judge, she declined to give them a taped statement. I think he's getting close to her commenting on her right to remain silent and that's getting close to a mistrial if he gets into evidence at some point she declines to give a statement. It's an unpermissible [sic] inference to raise or to comment on. And I object to this line of questioning and where it's leading.

THE COURT: What's your position?

[Prosecutor]: All I'm asking is if he offered her the opportunity to make a taped statement. He's going to say, "Yes." And did she decline to make a statement? Yes. I don't think it's a comment on her right to counsel. She's already waived her right to counsel.

THE COURT: The objection will be overruled.

(The following proceedings were had in normal tones.)

[Prosecutor:] Okay. Would you just answer these questions "yes" or "no."

Did you afford Ms. Woods an opportunity to make — give a formal taped statement?

[Officer Wilson:] Yes.

[Prosecutor:] Did she decline to give a statement?

[Officer Wilson:] Yes, sir.

[Prosecutor]: That's all.

[Defense counsel]: Your Honor, I move for a mistrial based on this witness' answers to the last two questions in that it's an unfair comment on defendant's right to remain silent.

THE COURT: The motion for mistrial will be overruled.

Following the close of evidence in the jury trial, several instructions were given, including instruction No. 13, to which Woods objected and which states:

> There has been evidence that the Defendant was drinking and/or using drugs prior to the time that the crimes with which she is charged were committed.
>
> Intoxication is a defense only when a person's mental abilities were so far overcome by the use of alcohol or drugs that she could not have had the required intent. You may consider evidence of alcohol or drug use along with all of the other evidence in deciding whether the Defendant had the required intent.

## ASSIGNMENTS OF ERROR

Woods assigned as error to the Court of Appeals:

[1.] The trial court erred in overruling Defendant's motion for a mistrial.

[2.] The trial court erred in instructing the jury on the defense of intoxication, when such instruction was not requested by the defense and was contradictory to the proffered theory of self-defense.

[3.] The evidence is insufficient, as a matter of law, to support the conviction.

On her petition for further review, Woods asserts that the Court of Appeals erred in finding harmless error upon the prosecutor's comment on Woods' post-*Miranda* silence, and further erred by failing to find that a substantial right of Woods was affected by the trial court's erroneous instruction on intoxication.

## STANDARD OF REVIEW

In reviewing a criminal conviction, it is not the province of the appellate court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the finder of fact, and the verdict of the jury must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Bronson*, 242 Neb. 931, 496 N.W.2d 882 (1993); *State v. Farrell*, 242 Neb. 877, 497 N.W.2d 17 (1993).

## ANALYSIS

### MOTION FOR MISTRIAL

Woods argues that the trial court erred in overruling her motion for mistrial, which was based on questions asked by the prosecutor. She claims the questions deprived her of due process by allowing her constitutional right of silence to be improperly used against her at trial.

The decision of whether to grant a motion for mistrial is within the discretion of the trial court and will be upheld on appeal absent a showing of abuse of discretion. *State v. Trackwell*, 244 Neb. 925, 509 N.W.2d 638 (1994); *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993); *State v. Morrison*, 243 Neb. 469, 500 N.W.2d 547 (1993).

The U.S. Supreme Court, in *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), held that a prosecutor's use of a defendant's postarrest, post–*Miranda* silence is fundamentally unfair because *Miranda* warnings imply not only that a person has the right to remain silent but that his or her silence will not be used against him or her as evidence of guilt. It makes no mention of an exception to this rule to permit use of postarrest, post–*Miranda* silence if the defendant has previously given a statement. Here, the prosecutor elicited testimony from a police officer about Woods' refusal to give a tape–recorded statement after Woods had given an oral statement, a refusal which occurred post–*Miranda*.

A defendant's refusal to give a statement constitutes "silence," regardless of whether the defendant has previously given a statement to police. As a result, use of the police officer's statement about Woods' refusal to give a tape–recorded statement was fundamentally unfair and constitutes a violation of due process. See *State v. Lofquest*, 227 Neb. 567, 418 N.W.2d 595 (1988). Thus, there was an abuse of discretion.

### JURY INSTRUCTIONS

We next address Woods' contention that the trial court erred in instructing the jury on the defense of intoxication, when Woods did not request the instruction and it contradicted her proffered theory of self-defense. Woods argues that the court erred in giving instruction No. 13.

Woods did not request an instruction on intoxication as a defense, and she objected to instruction No. 13. Woods argues that she was not proceeding on the theory of intoxication as a defense and that her theory of self-defense contradicted the defense of intoxication. She argues that a finding of intoxication would "negate any basis for finding that [Woods] had a reasonable belief that the use of force was necessary to protect herself." Brief for appellant at 12-13. Woods asserts that the prosecutor insisted on instruction No. 13 to confuse and mislead the jury. In other words, if Woods was so intoxicated that she could not form the necessary intent to kill, then she would also be too intoxicated to believe that she needed to protect herself, which related to her self-defense claim.

In an appeal based on the claim of an erroneous instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. Derry*, 248 Neb. 260, 534 N.W.2d 302 (1995); *State v. McHenry*, 247 Neb. 167, 525 N.W.2d 620 (1995); *State v. Flye*, 245 Neb. 495, 513 N.W.2d 526 (1994).

The jury could have considered whether Woods was "so far overcome by the use of alcohol" that she was incapable of exercising the powers of reason necessary to act in self-defense, even though there was insufficient evidence in the record to warrant an instruction on intoxication.

As indicated in the following excerpt from the State's closing argument, the State hoped to undercut Woods' theory of self-defense by encouraging the jury to consider whether Woods' ability to reason was so impaired by alcohol that she could not have acted in self-defense:

> [Prosecutor]: . . . [I]f you want to think in terms of self-defense, if that's what she's claiming, and what you have really here is a hybrid defense of self-defense and accident, maybe I was drinking too much —
>
> [Defense counsel]: I'm going to object as outside the scope of my argument.
>
> THE COURT: The objection will be overruled.
>
> [Prosecutor]: If you want to apply self-defense, then you have to understand what you're applying it to is an

> intentional act. If I want to claim that I killed somebody in self–defense, I also have to do part of that saying I intended to do that. So I did it in self–defense. If you didn't intend it, that isn't self–defense.

By introducing instruction No. 13, the State apparently sought to sow in the minds of the jurors the idea that the fight between Woods and Culliver was simply a drunken brawl between two women in which one of the brawlers produced a knife.

In our review of the instructions, we find that the court should not have given the intoxication instruction over Woods' objection. Because Woods relied on the theory of self–defense, there was no reason to instruct the jury that Woods had been drinking or that intoxication was a defense. Woods made no attempt to rely upon voluntary intoxication as a defense and stated under oath that although she had some drinks she was not intoxicated. We find that under the circumstances of this case, the State should not have been permitted to force Woods to assert a defense through the use of an instruction on intoxication, when she expressly denied being intoxicated, did not intend to rely on intoxication as a defense, and the evidence did not support a finding of intoxication.

The issue, then, is whether instruction No. 13 was prejudicial to Woods or otherwise adversely affected one of her substantial rights. See, *Derry, supra*; *McHenry, supra*; *Flye, supra*. We find that instruction No. 13 could well have materially influenced the jury to reject Woods' theory of self–defense.

Having reviewed the record, we find that instruction No. 13 was confusing and misleading to the jury and that it might have influenced the jury to determine that Woods was "so far overcome by the use of alcohol" that she was incapable of exercising the powers of reason necessary to act in self–defense.

Therefore, for the foregoing reasons, the judgments of conviction are reversed, and this cause of action is remanded to the district court for a new trial.

The trial of this matter was held before this court decided *State v. Jones*, 245 Neb. 821, 515 N.W.2d 654 (1994). Therefore, the district court, when instructing the jury on remand, is to remove the word "intent" from the manslaughter instruction.

## CONCLUSION

The judgments of conviction and the sentences are reversed, and this cause of action is remanded to the district court for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

WRIGHT and CONNOLLY, JJ., not participating.

GERRARD, J., concurring.

I agree with the judgment of the majority. However, my view is that criminal homicide as the result of legally recognized provocation, i.e., upon a sudden quarrel, distinguishes the first–prong ("sudden quarrel") manslaughter from the crime of murder in the second degree. My concurrence in this judgment should not be read as an adherence to the view that an intentional killing committed "upon a sudden quarrel" can never constitute the crime of manslaughter. While the law currently is to the contrary, I do not adhere to the view that "[t]he distinction between second degree murder and manslaughter upon a sudden quarrel is the presence or absence of an intention to kill." *State v. Jones*, 245 Neb. 821, 830, 515 N.W.2d 654, 659 (1994) (*overruling, State v. Pettit*, 233 Neb. 436, 445 N.W.2d 890 (1989)).

CAPORALE, J., concurring in part, and in part dissenting.

I agree with the judgment of the majority. However, while I am mindful that the law currently is to the contrary, I am nonetheless of the view that there are instances in which intent should be an element of manslaughter. *State v. Jones*, 245 Neb. 821, 515 N.W.2d 654 (1994) (Caporale, J., concurring in part, and in part dissenting).

FAHRNBRUCH, J., concurring in part, and in part dissenting.

Although I agree with the majority's conclusion to grant Woods a new trial, I respectfully disagree with its reasoning as to the jury instruction regarding the defendant's use of alcohol or drugs.

In my opinion, the trial court properly instructed the jury to consider evidence of alcohol or drug use in deciding whether the defendant had the required intent. Because manslaughter is an unintentional act, intent, in this case, goes only to the issue

of justification. See *State v. Jones*, 245 Neb. 821, 515 N.W.2d 654 (1994).

Woods raised the affirmative defense of justification, claiming that she believed the force she used against the victim was necessary to protect herself against death or serious bodily harm compelled by the victim's assault. A defendant's intentional infliction of physical harm upon another is said to be justified when the defendant acts in self-defense. See 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 5.7(i) (1986). The question of whether a defendant has a reasonable and good faith belief in the necessity to use force is a question of fact to be determined by a jury and is not to be determined solely by the defendant's own subjective belief in the necessity to use force. *State v. Myers*, 244 Neb. 905, 510 N.W.2d 58 (1994). Therefore, to consider Woods' claim of self-defense, it is essential that the jury consider whether Woods had the capacity to reasonably believe she was in danger and intentionally respond to that reasonable belief.

The record reflects alcohol or drug use by Woods on the night of the victim's death. Woods admitted in her testimony that she consumed approximately one drink per hour that night, and when asked if she was impaired in any way, she responded: "Yeah, I was high." Denise Coleman testified that Woods sounded drunk when she called and asked Coleman to come to her apartment with beer. The arresting officer testified that Woods appeared under the influence of drugs and that Woods told the arresting officer that she, the victim, and a man "had been partying for quite some period of time," which included smoking crack cocaine.

The jury needed to consider whether Woods was under the influence of alcohol or drugs or both to such a degree that she could not have the requisite protective intent to act in self-defense. The majority opinion emphasizes that Woods did not request the intoxication instruction. However, it is the duty of the trial court to instruct the jury on the law of the case whether requested to do so or not. *State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462 (1983). Therefore, the trial court did not err in instructing the jury to consider evidence of alcohol or drug use.