277 Neb. 629
STATE OF NEBRASKA, APPELLEE,
v.
PETER M. SINICA, JR., APPELLANT.
No. S-08-042.
Supreme Court of Nebraska.
Filed April 23, 2009.
Dennis R. Keefe, Lancaster County Public Defender, and Matthew G. Graff for appellant.
Jon Bruning, Attorney General, and James D. Smith for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
STEPHAN, J.
Peter M. Sinica, Jr., appeals his conviction and sentence following a trial by jury on the charge of intentional child abuse resulting in death. Sinica was sentenced to a term of imprisonment of 20 to 30 years. We affirm the conviction and sentence.

BACKGROUND
Tori Ziana Lee Stone (Tori) died on July 27, 2006. Her father, Sinica, was charged with intentional child abuse resulting in death, a Class IB felony.[1] He entered a plea of not guilty and was tried by a jury. We summarize those proceedings.
Tori was born on May 10, 2006. She was the child of Sinica and Tory Lee Stone, both unmarried Lincoln residents who lived apart and had ended their relationship by the time of Tori's birth. Tori lived with Stone for the first month of her life, but stayed with Sinica at his home for short periods during that time. In mid-June, Stone asked Sinica to keep Tori with him for an indefinite period of time, and he agreed to do so. Shortly thereafter, Sinica initiated proceedings to gain legal custody of the child. The court awarded joint custody of Tori to Sinica and Stone, with each to have physical custody on a rotating basis.
Sinica described Tori as being "fussy" and crying more than usual in July 2006. On July 10, a doctor treated Tori for an inner ear infection. Sinica testified that on that evening, Tori was "fussy" and had "mild vomiting." Sinica testified that on the following day, Tori rolled off his bed and may have hit her head on a rock which was on the floor next to the bed. At some time during this period, Sinica told Stone that Tori had slipped out of his hands and hit her head while he was bathing her. Tori was with Stone during the weekend of July 14 to 17, and then Stone returned her to Sinica's residence. Stone testified that during the weekend, Tori cried more than usual but that Stone did not notice any bruising on the child's head or body.
Sinica testified that Tori was "fussy" and "spitting up" on July 17 and 18, 2006, and that she was vomiting and had diarrhea by July 19. Sinica admitted that out of frustration, he shook the child for "a couple of seconds" on the evening of July 19, but denied that he intended to harm her. On the following day, Sinica took Tori to the doctor because she was still vomiting and had diarrhea. He did not mention that he had shaken her the night before, because he did not think that the shaking had caused any harm. The doctor suggested admitting Tori to the hospital for observation, but after consulting with his father, Sinica declined. He agreed to watch her carefully and return her to the doctor's office if her symptoms worsened. When Stone came to pick up Tori on July 20 or 21, Sinica told her that Tori was sick and had been to the doctor and that it would not be wise for her to be around Stone's other children. Stone noticed that Tori was crying more than usual. She decided to leave Tori with Sinica, who was then residing with his parents. Sinica testified that Tori's symptoms had subsided by July 23 and that when he took her to the doctor for a followup visit on July 24, he was told that she was "perfectly healthy."
On July 26, 2006, Sinica fed Tori between 6 and 7 p.m. and then put her to bed. He testified that she was still asleep at approximately 10 p.m. and that she continued to sleep when he repositioned her. He next checked her at midnight, and again she did not awaken when he repositioned her head. At approximately 1:30 a.m., he heard crying, so he changed Tori's diaper, gave her a pacifier, and laid her on his bed while he went to the kitchen to prepare a bottle. Sinica testified that when he returned to the bedroom about 10 minutes later, Tori was lying face down on the bed. When he picked her up to give her the bottle, he noticed that she was not breathing normally, her lips were blue, and she was making a gurgling sound. Sinica testified that when he realized Tori was not responding, he became frantic, picked her up, and shook her. He later told police that he shook her hard enough that her head and legs were "flopping back and forth." Sinica testified that he shook the child in an attempt to obtain a response, but with no intent to harm her. When Tori did not respond and Sinica was unsuccessful at reviving her with CPR and chest compressions, he and his father took her to a nearby fire station for medical attention. When they arrived at approximately 2:25 a.m., an emergency medical technician detected a faint pulse but no spontaneous respiration. The technician called for an ambulance and continued his efforts to resuscitate the child until the ambulance arrived and transported her to a Lincoln hospital. She was then transported by "Life Flight" to Children's Hospital in Omaha.
A physician at the pediatric intensive care unit of Children's Hospital noted that when he took over Tori's care at approximately 8 a.m., she "already had signs that she was neurologically devastated." CT scans revealed both old and new head injuries. Tori's condition did not change, and she died that evening. An autopsy performed on the following day revealed extensive bleeding and swelling of her brain. The forensic pathologist who performed the autopsy testified to a reasonable degree of medical certainty that the cause of death was "severe closed head injury or craniocerebral trauma with extensive acute subdural and subarachnoid hemorrhage, a massive acute cerebral edema." The pathologist testified that beyond these fatal injuries, he also found evidence of multiple healed rib fractures, an "old" fracture of a lumbar vertebra, and "corner fractures" of both tibial bones. The pathologist testified that in his opinion, Tori died as a result of homicide caused by intentionally inflicted injuries.
At the instruction conference held at the conclusion of trial, the court proposed a step instruction which permitted the jury to find Sinica either not guilty or guilty of one of the following offenses: (1) intentional child abuse resulting in death, (2) intentional child abuse resulting in serious bodily injury, (3) intentional child abuse, or (4) negligent child abuse. The State objected to the inclusion of negligent child abuse, arguing that it was not supported by the evidence. Sinica's counsel argued that negligent child abuse was a lesser-included offense of intentional child abuse resulting in death and that the evidence provided a rational basis upon which the jury could conclude that Sinica acted negligently. The court overruled the State's objection. Sinica's counsel did not object to any portion of the court's proposed instruction, but requested that it be amended to include the following language:
2. Regarding the charge of Manslaughter, the State must prove beyond a reasonable doubt:
a. that Peter Sinica, Jr., caused the death of Tori Stone;
b. that he did so unintentionally;
c. that he did so while in the commission of the unlawful act of Negligent Child Abuse . . .;
d. that he did so on, about or between July 13, 2006, and July 27, 2006; and
e. that he did so in Lancaster County, Nebraska.
The State objected to this amendment, arguing that manslaughter was not a lesser-included offense of intentional child abuse resulting in death. The court overruled Sinica's proposed amendment and gave the step instruction as originally proposed. The jury was given separate verdict forms for its use in returning a verdict of guilty of one of the four offenses listed in the step instruction or not guilty. After deliberating, the jury returned a verdict of guilty on the charged offense of intentional child abuse resulting in death. After Sinica was convicted and sentenced for that offense, he perfected this timely direct appeal.

ASSIGNMENT OF ERROR
Sinica's sole assignment of error is that the district court erred in failing to instruct on the lesser-included offense of manslaughter.

STANDARD OF REVIEW
[1-3] Whether a crime is a lesser-included offense is determined by a statutory elements approach and is a question of law.[2] Whether jury instructions given by a trial court are correct is a question of law.[3] When reviewing questions of law, we resolve the questions independently of the lower court's conclusions.[4]

ANALYSIS
This appeal presents the legal issue of whether involuntary manslaughter is a lesser-included offense of intentional child abuse resulting in death. Conceptually, a lesser-included offense is a "device that permits a jury to acquit a defendant of a charged offense and instead to convict of a less serious crime that is necessarily committed during the commission of the charged offense."[5] A court must instruct on a lesser-included offense if (1) the elements of the lesser offense for which an instruction is requested are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense.[6] To determine whether one statutory offense is a lesser-included offense of the greater, Nebraska courts look to the elements of the crime and not to the facts of the case.[7]
Child abuse offenses are defined by § 28-707. The statute defines multiple offenses ranging in severity from a Class I misdemeanor to a Class IB felony, depending upon the state of mind of the abuser and the result of the abuse.[8] At the time of the offense and trial involved in this case, § 28-707 provided in pertinent part:
(1) A person commits child abuse if he or she knowingly, intentionally, or negligently causes or permits a minor child to be:
(a) Placed in a situation that endangers his or her life or physical or mental health;
(b) Cruelly confined or cruelly punished;
(3) Child abuse is a Class I misdemeanor if the offense is committed negligently.
(4) Child abuse is a Class IIIA felony if the offense is committed knowingly and intentionally and does not result in serious bodily injury as defined in section 28-109.
(5) Child abuse is a Class III felony if the offense is committed knowingly and intentionally and results in serious bodily injury as defined in such section.
(6) Child abuse is a Class IB felony if the offense is committed knowingly and intentionally and results in the death of such child.
Sinica was charged with intentional child abuse resulting in death, a Class IB felony under § 28-707(6).
We held in State v. Parks[9] that misdemeanor negligent child abuse is a lesser-included offense of felony intentional child abuse, noting that "it is impossible to commit intentional child abuse without also committing negligent child abuse." Parks did not involve a death, but in two subsequent cases, State v. Blair[10] and Molina,[11] we relied upon Parks to conclude that negligent child abuse was a lesser-included offense of intentional child abuse resulting in death. Neither of those cases presented the issue of whether the jury should have been instructed on the lesser-included offense of manslaughter.
At the time of the offense and trial in this case, Nebraska's manslaughter statute provided in pertinent part: "(1) A person commits manslaughter if he . . . causes the death of another unintentionally while in the commission of an unlawful act."[12] We have characterized this offense as "involuntary manslaughter."[13] It is a Class III felony.[14] Applying the elements test stated above, we conclude that one cannot commit the greater offense of intentional child abuse resulting in death without simultaneously committing the lesser offense of involuntary manslaughter. The difference between the two lies in the actor's state of mind. If the abuse resulting in death was committed knowingly and intentionally, it is a Class IB felony as defined in § 28-707(6). If the child abuse which results in death is committed negligently, it is the misdemeanor offense defined by § 28-707(3) which constitutes the predicate "unlawful act" for the lesser offense of involuntary manslaughter. Thus, involuntary manslaughter is a lesser-included offense of child abuse resulting in death and the jury should be so instructed if there is a rational basis upon which it could conclude that the defendant committed child abuse negligently, but not knowingly and intentionally.
We recognize tension between our holding today and our analytical approach in State v. White.[15] In that case, the defendant was charged with first degree murder and the jury was instructed on lesser-included offenses of second degree murder and manslaughter. The jury convicted the defendant of manslaughter. On appeal, the defendant argued that the trial court erred in denying his request to instruct on additional lesser-included offenses of child abuse and third degree assault. Applying the statutory elements approach, we concluded that it was possible to commit manslaughter without committing child abuse or third degree assault and that therefore, neither was a lesser-included offense of manslaughter.
Our analysis in White suggests that a linear application of the statutory elements approach should be undertaken where several offenses are claimed to be lesser-included offenses of the charged offense. In determining whether child abuse and third degree assault were lesser-included offenses in White, we did not look to whether their elements were necessarily included in the charged offense of first degree murder. Instead, we compared the elements of child abuse and the elements of third degree assault to those of manslaughter, which was itself a lesser-included offense on which the defendant was ultimately convicted. With respect to the child abuse offense, the result would have been the same under either approach, because it is possible to commit first degree murder or manslaughter without committing child abuse. But the linear analysis employed in White would prevent a jury from considering alternative lesser-included offenses, i.e., all crimes which constitute lesserincluded offenses of the charged offense, regardless of their relationship to each other.
Other courts have employed a broader application of the statutory elements approach or a similar analytical device which permits the jury to consider all lesser-included offenses of the charged offense. For example, the rule in Vermont is that "[a] criminal defendant is entitled to have the jury instructed on every offense that is composed solely of some of the same elements as the offense charged and is supported by the evidence."[16] Illinois courts employ a "charging instrument approach" which permits a jury to consider all "less serious offenses that are included in the charged offense,"[17] but not less serious, unrelated offenses which were not charged.[18] In Indiana, the statutory elements of the charged crime are compared with the statutory elements of the lesser offense to determine whether the latter is "inherently included" in the former and is thus a lesser-included offense.[19]
Comparing the elements of a proposed lesser-included offense to those of the offense charged is consistent with the purpose of a lesser-included instruction, which is to give the jury reasonable alternatives to conviction on the charged offense or acquittal, where the evidence supports such alternatives.[20] For example, where a defendant is charged with intentional child abuse resulting in death and there is conflicting evidence as to whether the child abuse was intentional or negligent, a jury which concludes that the child abuse resulted in death should have the option of finding the defendant guilty of the charged offense or the lesser-included offense of manslaughter, based on the predicate unlawful act of negligent child abuse. Likewise, in such a case where there is conflicting evidence as to whether the child abuse caused death, the jury should be permitted to consider the lesser felony and misdemeanor child abuse offenses defined by § 28-707(1) and (3) through (5).[21] We therefore hold that in conducting the first step of the statutory elements approach to determine whether a lesser-included offense instruction should be given, the "greater offense" should be the offense with which the defendant is charged. Thus, if it would be impossible to commit the charged offense without simultaneously committing the lesser offense, and the evidence produces a rational basis for acquitting the defendant of the former and convicting of the latter, the lesser offense should be included in the step instruction regardless of its relationship to other lesser-included offenses in the instruction. To the extent that State v. White[22] suggests otherwise, it is disapproved.
Based upon the foregoing, we conclude that the district court erred in not instructing the jury on involuntary manslaughter as a lesser-included offense of child abuse resulting in death. To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.[23]
The step instruction given by the district court could not have been prejudicial to Sinica despite the fact that it did not include manslaughter as a lesser-included offense of intentional child abuse resulting in death. Error in failing to instruct the jury on a lesser-included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to the defendant under other properly given instructions.[24] In Molina, we held that the failure to instruct on negligent child abuse as a lesserincluded offense of child abuse resulting in death was not prejudicial, because the jury was required by an instruction on another count to determine whether or not the defendant acted with the intent to kill, and concluded that he did. We reasoned that the "same jury could not have concluded that [the defendant] acted without intent" with respect to the child abuse charge.[25]
This case presents a similar circumstance. The step instruction given by the trial court specifically instructed the jury that if it determined that the State proved each element of intentional child abuse resulting in death beyond a reasonable doubt, it must find Sinica guilty of that offense and proceed no further. When such a step instruction is given, we presume that the jury followed the instruction and did not consider any of the purported lesser-included offenses after finding that the defendant was guilty of the charged offense.[26] Having specifically found that Sinica acted intentionally, we must presume that the same jury could not have found that he acted without intent and committed negligent child abuse, which would have been the predicate act for an involuntary manslaughter instruction.

CONCLUSION
For the reasons discussed, we affirm the judgment of the district court.
Affirmed.
NOTES
[1] See Neb. Rev. Stat. § 28-707 (Reissue 2008).
[2] State v. Draganescu, 276 Neb. 448, 755 N.W.2d 57 (2008); State v. Gresham, 276 Neb. 187, 752 N.W.2d 571 (2008).
[3] State v. Draganescu, supra note 2; State v. Molina, 271 Neb. 488, 713 N.W.2d 412 (2006).
[4] State v. Draganescu, supra note 2.
[5] Michael H. Hoffheimer, The Rise and Fall of Lesser Included Offenses, 36 Rutgers L.J. 351, 354 (2005).
[6] State v. Draganescu, supra note 2; State v. Gresham, supra note 2.
[7] State v. Draganescu, supra note 2; State v. Williams, 243 Neb. 959, 503 N.W.2d 561 (1993).
[8] See State v. Parks, 253 Neb. 939, 573 N.W.2d 453 (1998).
[9] Id. at 948, 573 N.W.2d at 459.
[10] State v. Blair, 272 Neb. 951, 726 N.W.2d 185 (2007).
[11] State v. Molina, supra note 3.
[12] Neb. Rev. Stat. § 28-305 (Reissue 2008).
[13] State v. Pettit, 233 Neb. 436, 454, 445 N.W.2d 890, 901 (1989), overruled on other grounds, State v. Jones, 245 Neb. 821, 515 N.W.2d 654 (1994).
[14] § 28-305(2).
[15] State v. White, 217 Neb. 783, 351 N.W.2d 83 (1984).
[16] State v. Russo, 177 Vt. 394, 400, 864 A.2d 655, 661 (2004).
[17] People v. Ceja, 204 Ill. 2d 332, 359, 360, 789 N.E.2d 1228, 1246, 273 Ill. Dec. 796, 814 (2003).
[18] People v. Davis, 213 Ill. 2d 459, 821 N.E.2d 1154, 290 Ill. Dec. 580 (2004).
[19] Brown v. State, 770 N.E.2d 275, 280 (Ind. 2002).
[20] See, Beck v. Alabama, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980); State v. Molina, supra note 3.
[21] See State v. Muro, 269 Neb. 703, 695 N.W.2d 425 (2005).
[22] State v. White, supra note 15.
[23] State v. Moore, 276 Neb. 1, 751 N.W.2d 631 (2008); State v. Hessler, 274 Neb. 478, 741 N.W.2d 406 (2007).
[24] State v. Molina, supra note 3.
[25] Id. at 521, 713 N.W.2d at 442.
[26] See, State v. Derry, 248 Neb. 260, 534 N.W.2d 302 (1995); State v. Pribil, 224 Neb. 28, 395 N.W.2d 543 (1986).