STATE OF NEBRASKA, APPELLEE, V. THOMAS ALLAN MCBRIDE,
APPELLANT.

550 N.W.2d 659

Filed July 19, 1996.   No. S-95-1149.

Arthur C. Toogood, Adams County Public Defender, for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

CONNOLLY, J.

The appellant, Thomas Allan McBride, was convicted by a jury of first degree murder and use of a weapon to commit a felony. The district court for Adams County sentenced McBride to life in prison for the murder and a consecutive term of 19 to 20 years' imprisonment on the use of a weapon conviction. McBride appeals. We determine that all of McBride's assigned errors are without merit. As a result, we affirm.

## I. BACKGROUND

McBride and Sharon Oster, the victim of this murder, had lived together off and on throughout the years that they had known each other. On February 6, 1994, almost a year prior to the day Oster was murdered, McBride allegedly assaulted and sexually assaulted Oster. Subsequently, McBride was charged, by an information filed March 16, with the crimes of first degree sexual assault, second degree assault, and use of a weapon in the commission of a felony.

On February 5, 1995, Oster took a taxi to visit her friend Connie Paulson at Paulson's apartment in Hastings, Nebraska. Paulson had known Oster and McBride for years. Paulson testified that Oster arrived unexpectedly at approximately 1 a.m. Paulson further testified that McBride came to her apartment earlier in the day (approximately 11 a.m.) on February 4 and that they went to a place called Ray's at approximately 2 p.m. McBride and Paulson left Ray's at approximately 5 p.m. and went to McBride's residence. They then went back to Paulson's apartment where they ate dinner, watched television, and drank some beer. According to Paulson, McBride did not become intoxicated.

At approximately 1 a.m., Oster arrived at Paulson's apartment. Paulson knew that there had been previous trouble between Oster and McBride. Paulson told Oster that McBride was there and that she did not want any trouble with either of them. Oster appeared uneasy, but stayed anyway. As Paulson showed Oster her new apartment, McBride stayed in the living room watching television. Approximately 45 minutes later, Oster and Paulson returned to the living room and sat down to watch television.

Having said nothing to Oster during the 15 minutes they all watched television, McBride suddenly leaped off of the sofa, landed on Oster's chair causing it to collapse, and began beating her. Paulson yelled at McBride, tried to pull him off of Oster, and noticed that Oster appeared to be semiconscious. She got between McBride and Oster and told him to leave, but McBride shoved her aside. McBride called Oster vulgar names and stated that "if he was going to prison, that [Oster] was going down too."

Paulson had been thrown off balance by McBride when he shoved her. When she regained her balance, McBride was beating Oster again. Suddenly he stopped and stepped back from Oster. As Paulson walked toward Oster, McBride said, " 'Well, don't worry about it,' " that he " 'did what I told her I was going to do,' " and " '[s]he's dead, so you don't have to worry about it . . . .' " As Paulson turned around toward McBride, she saw that McBride had a knife in his hand, and she saw blood on the knife.

Paulson hurried over to Oster to see if McBride's statements were accurate. Although Paulson saw no injuries on Oster's body or torso, she saw a slash to Oster's throat. Paulson stood stunned for a moment, moved behind the chair, and stated that she had to get an ambulance. McBride took a step toward her, asking if she was going to " 'nark' " on him too. Paulson fled, running upstairs to another apartment to use the phone. A couple of young men let her in to call the 911 emergency service. One of the men, Terrence Wickham, made the call to 911 while Paulson relayed information to him about the incident. Paulson testified that when she fled her apartment, Oster was fully clothed and sitting in the chair.

Wickham testified that after placing the 911 call, he went down to Paulson's apartment with the police. The police yelled for McBride to come out and told Wickham to stand back. Wickham and his friend, Brad Randolph, went around the outside of the building to watch the front door, where Wickham said he saw a couple of police officers. One officer looked in the window and stated that there was a body in the apartment. Wickham heard a couple of kicks to the door and a window break and witnessed a swarm of officers rush into the apartment. Wickham observed the officers attempting to control someone and a naked body lying on the floor, spread eagle.

Officer Walter Eley of the Hastings Police Department testified that he went to the door of Paulson's apartment, knocked, and told whoever was inside that the police were outside. Someone inside asked if he was sure they were the police, and Eley responded that they were the police. Although the voice said no more, Eley heard sounds like clothing rustling and then a chopping noise from inside the apartment. After gaining entry into the apartment, Eley checked on the victim in order to ascertain her condition. He stated that there was a lot of blood on and around her naked body and that she appeared dead.

Officer Michael Hartman was also at the murder scene. As Hartman stood in the doorway of the apartment, he saw McBride hiding behind the refrigerator in the kitchen with a couple of cans of beer and a knife in his hands. Hartman told him to get on the floor. McBride responded with a vulgarity. Hartman repeated his command for McBride to get on the floor. This time, McBride threw the beer cans and the knife toward the officer and started to move toward him. Hartman was hit in the face with something as he and McBride struggled. Hartman eventually subdued and handcuffed McBride. Hartman took McBride to a hospital where McBride's clothing was confiscated as evidence.

Dr. Blaine Roffman, the pathologist who performed the autopsy, testified regarding Oster's injuries and the cause of her death. After discussing a multitude of stab wounds to the major organs of her body, Roffman concluded that Oster's death was caused by a stab wound to the heart. He stated that

the initial examination of the exterior of the body showed that there were contusions and bruises on both sides of the victim's face, a blunt laceration along the right earlobe, and lacerations and bruises on both lips. Roffman noted that there were nine stab wounds to the chest and abdomen, and a large laceration around the neck that penetrated and severed the trachea and larynx. Upon examination of the interior of the body, Roffman noted there was a stab wound that penetrated both ventricles of the heart and 50 cubic centimeters of blood in the sac surrounding the heart. There was also a laceration to the upper lobe of the left lung and substantial blood in both of the pleural cavities. The liver and right kidney had been punctured three times. There was bleeding in the pancreas and kidney areas and three stab wounds in the transverse colon.

## 1. DEFENDANT AT HOSPITAL

David Nissen, a registered nurse at Mary Lanning Memorial Hospital, testified that he was on duty when police officers brought McBride in around 3 a.m on February 5, 1995. He stated that McBride, who was in street clothes, had a minor bloody nose and a few minor cuts and bruises. He also testified that McBride's hands were gloved in blood up to his wrists. He asked McBride what had happened, and McBride responded, " 'Done pissed me off, son bitch' " and " '[t]hat's all right, it was worth it.' " Nissen asked McBride how he had been injured and how he had come to have all the blood on his hands. After getting little response to his questions, Nissen asked McBride if he had taken any drugs or alcohol. McBride responded that he had " '[j]ust beer' " and had used " 'turkey.' " McBride then said that he " 'didn't get my Boy Scout female survival badge.' " Nissen said he did not know what to make of these statements, so he just wrote down what was said. Nissen noted that McBride did not appear to be intoxicated, but did appear to have been drinking.

## 2. RESIDUAL HEARSAY STATEMENTS

The State called a number of witnesses who testified that Oster had told them of threats that McBride had made against her in the last several months of her life. Nancy Ann

Ziegelbauer-Snider testified, first out of the presence of the jury, that in June 1994, she had talked to Oster, who told her that she was afraid McBride was going to kill her. Oster told Ziegelbauer-Snider that one day while she was walking to her job, McBride rode up to her on his motorcycle, pointed an imaginary gun at her, and pretended to shoot her with it.

McBride objected to the testimony as hearsay, but the trial court, having already been briefed on this issue, admitted the evidence under the residual hearsay rule. Ziegelbauer-Snider testified before the jury that in June 1994, Oster told her of the threat described earlier. Ziegelbauer-Snider stated that Oster left her job in Hastings because McBride knew where she worked and she was afraid.

Rita Rodgers also testified that she had talked with Oster about McBride's threat in November 1994. Oster told her that after this happened, she left her job and stayed a week in Superior, Nebraska, until she was calm enough to return to Hastings. Susan Pettit also talked to Oster about McBride's threats around Thanksgiving of 1994. Pettit described the same sort of simulated-gun threat that the other witnesses described.

Sharla Oster, the victim's daughter, testified that her mother told her about the threat that McBride had made against her. Tammy Jo Parkhurst, Oster's former boss, testified that Oster simply stopped reporting for work in June 1994 and never called or came back. Leslie Dana, Oster's direct supervisor, testified that around February 1994, Oster expressed fear that McBride would come into her place of employment and cause a problem. Tammy Booth, Oster's supervisor at her previous job, testified that Oster frequently requested to change shifts because she was afraid an ex-boyfriend would know her routine.

Robert Brophy, who had known McBride and Oster for many years, testified that he encountered McBride a few months before Oster's death. At that time, McBride told Brophy that he was on foot because he had sold his motorcycle for legal fees. Brophy stated that McBride appeared depressed about selling his motorcycle. During their conversation, McBride also mentioned that he had been kicked out of

the High Plains Drifters Motorcycle Club and that he had bought a knife. McBride further told Brophy that someday he was going to get even with Oster, or words to that effect.

### 3. JUDICIAL NOTICE OF PRIOR CHARGES

Finally, the trial court took judicial notice of its own court records, allowing the prosecution to inform the jury that McBride had charges of first degree sexual assault, second degree assault, and use of a weapon in the commission of a felony pending against him at the time of the murder and that Oster was the alleged victim. McBride objected to the jury receiving this information on the grounds that it was not relevant, that it was cumulative to evidence already offered, and that the prejudicial value substantially outweighed its probative value. After taking judicial notice, the court gave the jury the following limiting instruction:

> Now, ladies and gentlemen of the jury, there's a couple of things you need to know about what you just heard. I have taken judicial notice of that fact. You may but are not required to accept the fact as true.
>
> The second thing is that the county attorney has presented evidence of other crimes, wrongs, or acts. Now, you need to know first that — that the defendant was not convicted of those crimes, that they were pending; so he was presumed to be innocent of those crimes, but those crimes were pending at the time the victim was killed. Further, when you go to deliberate this case, I will give you a limiting instruction, and that is that the facts that I just took judicial notice of are not admissible to prove the character of the defendant or in order to show that he acted in conformity with that character. Those judicially noticed facts are, however, admissible for other purposes; such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
>
> The State is also going to argue that it is relevant to prove malice. So there's two things there I will give you a limiting instruction on what — at the end of this trial, and that limiting instruction goes to this evidence as to

what you can consider about it; and, secondly, it is a judicially noticed fact, which you may but are not required to accept as true.

At the end of trial, the court gave the following limiting instructions:

During the trial I took judicial notice of the fact that the Defendant in Case Number 94121 in the District Court of Adams County had been charged with assault in the second degree, use of a firearm to commit a felony, and first degree sexual assault; that these events allegedly occurred on February 6, 1994; and that the alleged victim was Sharon A. Oster. The Court further took judicial notice that the aforementioned case against Thomas Allan McBride was pending on the day of Sharon Oster's death on February 5, 1995, and that prior to this trial the Defendant had not been convicted of these crimes. You may but are not required to accept those facts as true.

. . . .

Evidence that the Defendant was charged with other crimes against Sharon Oster has been received only to aid in your determination of whether he had a motive, opportunity, intent, preparation, plan, or malice to kill Sharon Oster. The evidence of these other alleged crimes is not to be considered by you to show that he acted in conformity to these other acts on this occasion. You may consider the evidence only for the limited purpose stated above and for no other.

McBride did not offer any evidence at the close of the State's case. McBride objected to the court's instruction on the definition of malice and its definition of sudden quarrel in the manslaughter instruction. He offered his own instructions on the definition of malice and sudden quarrel, both of which the court declined to give. The jury found McBride guilty of first degree murder and the use of a weapon in the commission of a felony.

## II. ASSIGNMENTS OF ERROR

McBride alleges the district court erred in (1) failing to grant his motions for change of venue; (2) allowing the use of

evidence that he had been charged with other criminal offenses; (3) allowing hearsay evidence of alleged threats by him; (4) allowing, over objection, certain pictures of the deceased; (5) failing to grant his motion for a directed verdict of not guilty at the close of all evidence; (6) failing to grant his motion for new trial, because the verdict entered was not supported by sufficient evidence; (7) refusing instructions which were offered by him; and (8) abusing its discretion by imposing a sentence which was "excessive and disproportionate to the severity of the offense when considered with [his] background and prior record."

## III. STANDARD OF REVIEW

A motion for change of venue is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent an abuse thereof. *State v. McHenry, ante* p. 614, 550 N.W.2d 364 (1996); *State v. McHenry*, 247 Neb. 167, 525 N.W.2d 620 (1995); *State v. Bowen*, 244 Neb. 204, 505 N.W.2d 682 (1993).

In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the Nebraska Evidence Rules when judicial discretion is a factor involved in the admissibility of evidence. *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994); *State v. Anderson*, 245 Neb. 237, 512 N.W.2d 367 (1994).

The admissibility of evidence is reviewed for an abuse of discretion where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court. *State v. Eona*, 248 Neb. 318, 534 N.W.2d 323 (1995); *State v. Williams*, 247 Neb. 878, 530 N.W.2d 904 (1995).

Whether a trial court should have granted a motion for directed verdict at the close of the State's case is a question of law. Regarding questions of law, an appellate court is obligated to reach a conclusion independent of determinations reached by the trial court. *State v. Lynch*, 248 Neb. 234, 533 N.W.2d 905 (1995).

In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of dis-

cretion is shown, the trial court's determination will not be disturbed. *State v. Richter*, 240 Neb. 913, 485 N.W.2d 201 (1992); *State v. Jensen*, 238 Neb. 801, 472 N.W.2d 423 (1991).

In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Woods*, 249 Neb. 138, 542 N.W.2d 410 (1996); *State v. Hirsch*, 245 Neb. 31, 511 N.W.2d 69 (1994).

A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Kunath*, 248 Neb. 1010, 540 N.W.2d 587 (1995); *State v. Ladig*, 248 Neb. 737, 539 N.W.2d 38 (1995).

## IV. ANALYSIS

### 1. VENUE

McBride first alleges that the district court erred in failing to grant his pretrial motion for a change of venue. More specifically, McBride argues that he could not receive a fair and impartial trial in Adams County because of an article that appeared on the front page of the Hastings Daily Tribune following the denial of the State's motion to consolidate this case with the other charges pending against him. In that article, published approximately 1 month before the jury selection process began, the Adams County Attorney stated that she "was not overly disappointed by the ruling . . . and intends to pursue the sexual assault case whether or not McBride is convicted of murder. Even with a life sentence for murder, another conviction of sexual assault probably would influence any possible parole . . . ."

In his affidavit, McBride asserts that the county attorney used this publicity to imply her belief to the prospective venire panel that he was guilty of the crimes charged, and thus, the court should have granted his motion for change of venue in order to ensure that the panel was not unfairly tainted.

Neb. Rev. Stat. § 29-1301 (Reissue 1995) states:

> All criminal cases shall be tried in the county where the offense was committed . . . unless it shall appear to the court by affidavits that a fair and impartial trial cannot be had therein. In such case the court, upon motion of the defendant, shall transfer the proceeding to any other district or county in the state as determined by the court.

See, also, *State v. McHenry*, 247 Neb. 167, 525 N.W.2d 620 (1995).

A trial court abuses its discretion in denying a motion to change venue where a defendant establishes that local conditions and pretrial publicity make it impossible to secure a fair trial. *State v. McHenry, ante* p. 614, 550 N.W.2d 364 (1996); *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993). A number of factors must be evaluated in determining whether the defendant has met the burden of showing that pretrial publicity has made it impossible to secure a fair and impartial jury. Among them are:

> "the nature of the publicity, the degree to which the publicity has circulated throughout the community, the degree to which the publicity circulated in areas to which venue could be changed, the length of time between the dissemination of the publicity complained of and the date of trial, the care exercised and ease encountered in the selection of the jury, the number of challenges exercised during the voir dire, the severity of the offenses charged, and the size of the area from which the venire was drawn. . . ."

*State v. Bowen*, 244 Neb. 204, 208, 505 N.W.2d 682, 686 (1993).

Venire examination provides the best opportunity to determine whether venue should be changed. *Id.* In the instant case, a review of the jury selection process shows that there was no difficulty in selecting a jury from the pool of people called to serve. Defense counsel and the prosecution questioned the potential jurors about their exposure to pretrial publicity. Each side exercised all 12 peremptory challenges. No causal challenges were made. The selected jurors indicated

that they could be fair and impartial and render a verdict based on the evidence presented to them without being influenced by the newspaper accounts they had read. Furthermore, once peremptory challenges were exercised, no objection to the panel was made. As a result, we conclude the trial court did not abuse its discretion in overruling McBride's motion for change of venue because he failed to establish that a fair and impartial jury could not be selected in Adams County.

## 2. PENDING CRIMINAL CHARGES

McBride next alleges the district court erred in allowing the use of evidence that he had been charged with other criminal offenses. At trial, Officer Eley was the first witness called by the prosecution. Eley testified that on February 14, 1994, he took a report from Oster, and as a result, McBride became a criminal suspect. Eley further testified that he conducted an investigation and completed a report which he submitted to the county attorney.

The county attorney then asked the court to take judicial notice of the prior pending charges. Defense counsel called a sidebar conference, at which time he objected to the court taking judicial notice of the pending charges against McBride on the grounds that the charges were cumulative, that they were not relevant, and that their probative value was substantially outweighed by the danger of unfair prejudice. The court overruled the objections and took judicial notice of the following statement read by the county attorney in the presence of the jury:

> That filed with the Adams County District Court is a case entitled State of Nebraska versus Thomas Allan McBride, Case Number 94121; that within that case, the defendant herein, Thomas Allan McBride, is charged with assault in the second degree, use of a weapon to commit a felony, first degree sexual assault; that in — with regard to those charges, the alleged victim is Sharon Oster, and the events allegedly took place on February 6th, 1994; further, that said case against Thomas Allan McBride was pending on the day of Sharon Oster's death on February 5th, 1995.

#### (a) Not Evidence of Other Crimes, Wrongs, or Acts

As part of its limiting instructions, the court advised the jury:

[T]he facts that I just took judicial notice of are not admissible to prove the character of the defendant or in order to show that he acted in conformity with that character. Those judicially noticed facts are, however, admissible for other purposes; such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

From this instruction, it is clear the court took judicial notice of the pending charges after determining the evidence was admissible under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 1995). That section states:

*Evidence of other crimes, wrongs, or acts* is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(Emphasis supplied.)

Although evidence of another crime may sometimes be admissible in a criminal prosecution, as where its purpose is to show motive, scheme, or intent, or a system of mutually dependent crimes, or it bears upon the question of identity of the accused or articles connected with the offense . . . *to be admissible, it must be legal evidence that the crime was committed, and the mere indictment furnishes no such evidence.*

(Emphasis supplied.) *Waters v. State*, 82 Ga. App. 608, 609-10, 61 S.E.2d 794, 796 (1950). See, also, *U.S. v. Flores Perez*, 849 F.2d 1 (1st Cir. 1988); *State v. Trainor*, 130 N.H. 371, 540 A.2d 1236 (1988).

Likewise, we determine the mere fact that the county attorney charged McBride with previous crimes is not "evidence of other crimes, wrongs, or acts," let alone clear and convincing evidence that McBride committed the alleged crimes, wrongs, or acts. See rule 404(3). As a result, we conclude the district court incorrectly applied rule 404(2) in determining whether

the previous criminal charges filed against McBride were admissible evidence.

Where the record adequately demonstrates that the decision of a trial court is correct, although such correctness is based on a ground or reason different from that assigned by the trial court, an appellate court will affirm. *State v. Tlamka*, 244 Neb. 670, 508 N.W.2d 846 (1993). See *State v. Anderson*, 245 Neb. 237, 512 N.W.2d 367 (1994). As a result, we must next determine whether the record adequately demonstrates that the pending criminal charges filed against McBride were admissible evidence based on a different ground or reason.

### (b) Relevance

"Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995). *State v. Lee*, 247 Neb. 83, 525 N.W.2d 179 (1994); *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994). All relevant evidence normally is admissible. Evidence which is not relevant is not admissible. *State v. Fahlk, supra*; *State v. Thompson*, 244 Neb. 375, 507 N.W.2d 253 (1993). Because the exercise of judicial discretion is implicit in determinations of relevancy, the trial court's decision will not be reversed absent an abuse of discretion. *State v. Eona*, 248 Neb. 318, 534 N.W.2d 323 (1995); *State v. Williams*, 247 Neb. 878, 530 N.W.2d 904 (1995).

In the instant case, Paulson testified that as she tried to pull McBride off of Oster, he stated that "if he was going to prison, that [Oster] was going down too." Robert Brophy testified that he had known McBride and Oster for many years and that he encountered McBride a few months before Oster's death. At that time, McBride told Brophy that he was on foot because he had sold his motorcycle for legal fees. Brophy stated that McBride appeared pretty depressed about selling his motorcycle. McBride also mentioned to Brophy that he had been kicked out of the High Plains Drifters Motorcycle Club and that he had bought a knife. McBride further told Brophy

that someday he was going to get even with Oster, or words to that effect.

Motive is defined as that " ' "which leads or tempts the mind to indulge in a criminal act." ' " *State v. Bronson*, 242 Neb. 931, 940, 496 N.W.2d 882, 890 (1993). Accord *State v. Ruyle*, 234 Neb. 760, 452 N.W.2d 734 (1990). "While proof of motive is not an element of first degree murder, any motive for the crime charged is certainly relevant to the State's proof of the intent element." *State v. Bronson*, 242 Neb. at 940, 496 N.W.2d at 890.

McBride's express threats toward Oster, because of his anger over the possibility of going to jail and the expense of legal fees, make little sense to the jury if they are not made aware of the fact that criminal charges were pending against McBride at the time of the murder for allegedly assaulting and sexually assaulting Oster. The fact that these charges were pending against McBride, in combination with his statements, is evidence which the jury could find was the motive for McBride to murder Oster.

We determine motive to be relevant. As a result, we conclude the district court did not abuse its discretion in determining that the pending criminal charges were relevant evidence.

### (c) Probative Value Versus Prejudicial Effect

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995). The district court overruled McBride's objections that the evidence was cumulative and unfairly prejudicial. A ruling pursuant to rule 403 for exclusion of relevant evidence will be upheld on appeal unless the ruling is an abuse of discretion. *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994).

As for McBride's claim that evidence of the pending charges was cumulative, it is true that before this evidence was adduced, Officer Eley testified that he interviewed Oster, con-

ducted an investigation, and submitted a report to the county attorney in which McBride was a suspect. However, cumulative evidence means evidence tending to prove the same point of which other evidence has been offered. *State v. Toney*, 243 Neb. 237, 498 N.W.2d 544 (1993). Evidence that McBride became a suspect after an interview, investigation, and report by a police officer is not materially the same as evidence that criminal charges were pending against McBride and did not tend to prove the same point. McBride did not face the possibility of jail or incur any legal fees until after the charges were actually filed. As a result, we conclude evidence that criminal charges were pending against McBride was not cumulative to any other evidence adduced at trial.

The pending criminal charges are clearly probative of motive. Any prejudice incurred in the admission of this evidence was cured by the court's detailed limiting instructions. As a result, we conclude the district court did not abuse its discretion in finding that the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice. See rule 403.

### (d) Judicial Notice

Having determined that the pending charges were relevant and not prejudicial, the question remains whether the trial court erred in taking judicial notice of these charges. Neb. Evid. R. 201(1), Neb. Rev. Stat. § 27-201(1) (Reissue 1995), states that "[t]his rule governs only judicial notice of adjudicative facts." "Although [rule] 201 does not expressly require relevance for judicial notice, an irrelevant fact cannot be validly classified as an 'adjudicative fact,' the only type of fact noticeable under [rule] 201." *State v. Vejvoda*, 231 Neb. 668, 677, 438 N.W.2d 461, 468 (1989). "A fact is adjudicative if the fact affects the determination of a controverted issue in litigation . . . ." *Id.* at 675, 438 N.W.2d at 467.

The fact that McBride was charged with previous crimes against Oster is relevant to this case. We also determine that this fact affects the determination of motive—a controverted issue in this litigation. Motive is in controversy because McBride argued that he can only be convicted of manslaugh-

ter and not first or second degree murder. As stated, "While proof of motive is not an element of first degree murder, any motive for the crime charged is certainly relevant to the State's proof of the intent element." *State v. Bronson*, 242 Neb. 931, 940, 496 N.W.2d 882, 890 (1993). While intent is a material element of first and second degree murder, it is not a material element of manslaughter. See Neb. Rev. Stat. §§ 28-303, 28-304, and 28-305 (Reissue 1995). As a result, we conclude that the fact that McBride was charged with these previous crimes is an adjudicative fact.

Rule 201(2) pertains to judicial notice of adjudicative facts and states: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (a) generally known within the territorial jurisdiction of the trial court or (b) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

We conclude that the fact that McBride was charged with previous crimes in the Adams County District Court, the same court in which he was charged in the instant case, was a fact capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

However, we note that "judicial notice should be sparingly used in a criminal case." *State v. Vejvoda*, 231 Neb. at 683, 438 N.W.2d at 471. " ' "[T]aking evidence subject to cross-examination and rebuttal, is the best way to resolve controversies involving disputes of adjudicative facts . . . ." ' " *Id.* at 676, 438 N.W.2d at 467. In other words, " 'resort[ing] to judicial notice in criminal cases where the opposing party is prepared to introduce contrary evidence [is] highly undesirable.' " *Id.* at 682, 438 N.W.2d at 471.

In the instant case, other methods were available to have the prior filed charges admitted into evidence. However, we determine that McBride was given a full opportunity to introduce contrary evidence. He was given a full opportunity to cross-examine Officer Eley about his interview with Oster, the investigation he conducted, and the report he submitted to the county attorney. Furthermore, McBride was given a full opportunity to cross-examine Paulson and Brophy about the incriminating statements these witnesses testified McBride

made. As a result, we conclude the trial court did not err in taking judicial notice of the felony charges pending against McBride in which Oster was the alleged victim.

### 3. RESIDUAL HEARSAY EXCEPTION

Next, McBride alleges the district court erred in allowing hearsay evidence of alleged threats by him. Nancy Ann Ziegelbauer-Snider, Rita Rodgers, Susan Pettit, and Sharla Oster all testified that Oster had told them of threats that McBride had made against her in the last several months of her life. More specifically, these witnesses testified that Oster described to them how McBride had ridden up to her on his motorcycle while she was walking to her job one day and pointed an imaginary gun at her, pretending to shoot her with it. At trial, McBride objected to the testimony as hearsay, but the district court admitted the testimony under the residual hearsay exception.

Hearsay is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Neb. Evid. R. 801(3), Neb. Rev. Stat. § 27-801(3) (Reissue 1995); *State v. Neujahr*, 248 Neb. 965, 540 N.W.2d 566 (1995). The testimony of these witnesses, as to what Oster told them McBride did, was clearly hearsay. Hearsay is not admissible except as provided by the rules of evidence or by other rules adopted by the statutes of the State of Nebraska. Neb. Evid. R. 802, Neb. Rev. Stat. § 27-802 (Reissue 1995); *State v. Neujahr, supra.*

The residual hearsay exceptions are delineated in Neb. Evid. R. 803(22), Neb. Rev. Stat. § 27-803(22) (Reissue 1995), and Neb. Evid. R. 804(2)(e), Neb. Rev. Stat. § 27-804(2)(e) (Reissue 1995). The substance of these two evidence rules is identical except that unavailability of the declarant must be shown under rule 804(2)(e). These sections state:

> A statement not specifically covered by any of the [other exceptions to the hearsay rule] but having equivalent circumstantial guarantees of trustworthiness, [will be admissible,] if the court determines that (i) the statement is offered as evidence of a material fact, (ii) the statement is more probative on the point for which it is offered than

any other evidence which the proponent can procure through reasonable efforts, and (iii) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. A statement may not be admitted under this exception unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant:

Rule 804(2)(e).

Rule 804(1) provides in pertinent part: "Unavailability as a witness includes situations in which the declarant . . . [i]s unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity." Because of Oster's unavailability as a witness, we will analyze the admissibility of her statements under rule 804(2)(e). While we have said that the residual hearsay exception is to be used rarely and only in exceptional circumstances, *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990), we have also ruled that where the declarant is dead, the specific exceptions of rule 804(2)(e) are applicable in determining the existence of equivalent circumstantial guarantees of trustworthiness. *State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993); *State v. Beam*, 206 Neb. 248, 292 N.W.2d 302 (1980).

In determining whether a statement is admissible under rule 804(2)(e), a court considers five factors: (1) the statement's trustworthiness, (2) materiality of the statement, (3) probative importance of the statement, (4) interests of justice, and (5) whether notice of the statement's prospective use was given to the opponent. *State v. Toney*, 243 Neb. 237, 498 N.W.2d 544 (1993).

In the instant case, the district court went through each element of the *Toney* test and admitted the testimony about the simulated-gun threat into evidence. An appellate court, reviewing a trial court's ruling on admissibility under rule 804(2)(e), will affirm the trial court's ruling unless the trial

court has abused its discretion concerning admissibility. *State v. Toney, supra.*

### (a) Trustworthiness

Under rule 804(2)(e), a court must make a preliminary inquiry (Neb. Evid. R. 104, Neb. Rev. Stat. § 27-104 (Reissue 1995)) to determine whether a declarant had personal knowledge (Neb. Evid. R. 602, Neb. Rev. Stat. § 27-602 (Reissue 1995)) regarding the subject matter of the statement that is sought to be introduced pursuant to the residual exception to the hearsay rule. *State v. Toney, supra; State v. Jacob, supra.* Unlike the situation in *State v. Jacob*, where the deceased declarant lacked personal knowledge about the subject matter of her statements because she did not actually see the defendant shoot her, Oster's statements to the witnesses included the assertion that Oster personally witnessed McBride make the simulated-gun threat. As a result, we conclude that Oster had personal knowledge regarding the subject matter of the statements she made to the witnesses as required by rule 602.

In determining the trustworthiness of a statement under rule 804(2)(e), a court must examine the circumstances surrounding the declaration in issue and may compare the declaration to the closest hearsay exception as well as consider a variety of other factors affecting trustworthiness, such as

> the nature of a statement, that is, whether the statement is oral or written; whether a declarant had a motive to speak truthfully or untruthfully, which may involve an examination of the declarant's partiality and the relationship between the declarant and the witness; whether the statement was made under oath; whether the statement was spontaneous or in response to a leading question or questions; whether a declarant was subject to cross-examination when the statement was made; and whether a declarant has subsequently reaffirmed or recanted the statement.

*State v. Toney*, 243 Neb. at 245-46, 498 N.W.2d at 551. See *State v. Plant, supra.*

Although there are several factors to be considered in determining the trustworthiness of a statement under the residual

hearsay exception, the absolute basic requirement is that the circumstances surrounding the making of the hearsay statement provide the guarantees of trustworthiness comparable to other hearsay exceptions in the Nebraska Evidence Rules. *State v. Toney, supra; State v. Jacob, supra.*

In the instant case, the district court found the statements contained the requisite guarantee of trustworthiness for admissibility under the residual hearsay exception. The court found the nearest comparable hearsay exceptions to Oster's statements were "state of mind" and "excited utterance." We determine exited utterance to be the nearest hearsay exception.

The excited utterance exception excludes from the operation of the hearsay rule statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Rule 803(1); *State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993). The underlying theory of this exception is that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication. *State v. Jacob, supra; State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990). For a statement to qualify as an excited utterance, the following criteria must be established:

> " '(1) There must have been a startling event, (2) the statement must relate to the event, and (3) the statement must have been made by the declarant while under the stress of the event. . . . The key requirement is spontaneity, which "requires a showing the statements were made without time for conscious reflection." ' "

*State v. Jacob*, 242 Neb. at 186, 494 N.W.2d at 117.

Clearly, the feigned-gun threat would have been a startling event for Oster, and the record demonstrates her statements related to that event. Thus, our focus is on whether Oster had time to consciously reflect on her statements.

The cases of *State v. Smith*, 241 Neb. 311, 488 N.W.2d 33 (1992), and *State v. Castor*, 193 Neb. 86, 225 N.W.2d 420 (1975), set the outer boundaries of the excited utterance rule. In *State v. Castor*, this court held that a statement made 2 hours after an alleged rape was not spontaneous. Likewise, in

*State v. Smith*, this court held the statements of a sexual assault victim made after she had time to record the event in her diary did not qualify as an excited utterance, as there had been ample time for the victim to consciously reflect on the event.

In the instant case, Ziegelbauer-Snider testified that "in about June of 1994" Oster told her of the alleged threat and that Oster stated that the threat occurred in the "end of May, beginning of June." None of the other witnesses testified that Oster told them when McBride allegedly made this threat. All of the other witnesses were told of the alleged threat after Oster told Ziegelbauer-Snider of the alleged threat. Thus, based on Ziegelbauer-Snider's testimony, as long as 1 month could have passed between the time the threat was alleged to have occurred and the time when Oster told Ziegelbauer-Snider of the alleged threat.

Having considered all of the circumstances surrounding Oster's statements to these witnesses, we conclude that the statements lack spontaneity, that there was ample time for Oster to consciously reflect on this event, and that, thus, these hearsay statements do not provide the guarantees of trustworthiness comparable to the excited utterance exception, or any other hearsay exceptions, in the Nebraska Evidence Rules. See, *State v. Toney*, 243 Neb. 237, 498 N.W.2d 544 (1993); *State v. Jacob, supra* (statements made within 1 day of event). As a result, we conclude the district court erred in finding that the statements contained the requisite guarantee of trustworthiness for admissibility under the residual hearsay exception prescribed in rule 804(2)(e) and abused its discretion in admitting these statements into evidence.

### (b) Harmless Error

The erroneous admission of evidence in a criminal trial is not prejudicial if it can be said that the error was harmless beyond a reasonable doubt. *State v. Neujahr*, 248 Neb. 965, 540 N.W.2d 566 (1995). Harmless error exists in a jury trial of a criminal case when the court makes an erroneous evidentiary ruling which, on review of the entire record, did not materially influence the jury in a verdict adverse to the defen-

dant. *State v. Vogel*, 247 Neb. 209, 526 N.W.2d 80 (1995). If the evidence properly admitted at trial overwhelmingly establishes a defendant's guilt, any error in excluding admissible evidence is harmless error beyond a reasonable doubt. *Id.*

In the instant case, no evidence was adduced that a "sudden quarrel" of any kind took place between McBride and Oster. McBride sat watching television with Oster for approximately 15 minutes before attacking her and made incriminating statements during and after the attack. An eyewitness testified to the murder, the police recovered the murder weapon and apprehended McBride at the scene of the murder, and McBride made statements that implicated himself as the perpetrator of the crime.

Thus, we determine that the evidence properly admitted at trial overwhelmingly establishes McBride's guilt beyond a reasonable doubt. As a result, we conclude the error in admitting this evidence did not materially influence the jury in reaching its verdict and was harmless beyond a reasonable doubt.

### 4. PHOTOGRAPHS OF DECEASED

McBride further alleges the district court erred in allowing over objection certain pictures of the deceased. At trial, Dr. Blaine Roffman, the pathologist who performed the autopsy, testified on behalf of the State. During the course of Dr. Roffman's testimony, six photographs of Oster's body, taken at the time he performed the autopsy, were received into evidence.

The State then presented a diagram of the scene of the crime, complete with a legend to show where each item of evidence was found, where the body was located, and where each item of furniture was located. The district court then allowed the State to offer several pictures of Oster's body as it was found in the apartment. These photographs depict Oster's naked body lying on the floor of the crime scene beaten, bloody, and mutilated.

In objecting to the admission of these exhibits, McBride relies upon the principles stated in rule 403 as follows: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prej-

udice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." More specifically, McBride argues that because the State had already established the cause of death, offered autopsy pictures of the injuries, and established the location of all evidence, the admission of the additional crime scene photographs of Oster's body had no further evidentiary value, but was solely for the purpose of inflaming the minds of the jury against McBride.

The admission of photographs of a gruesome nature rests largely within the discretion of the trial court, which must determine their relevancy and weigh their probative value against their possible prejudicial effect. *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993); *State v. Rowe*, 210 Neb. 419, 315 N.W.2d 250 (1982). Although it is true that the probative value of gruesome photographs should be weighed against the possible prejudicial effect before they are admitted, if a photograph illustrates or makes clear some controverted issue in a homicide case, a proper foundation having been laid, it may be received, even if gruesome. *State v. Rowe, supra.* In a homicide case, photographs of the victim, upon proper foundation, may be received in evidence for purposes of identification, to show the condition of the body, to show the nature and extent of wounds or injuries, and to establish malice or intent. *State v. White, supra*; *State v. Rowe, supra.*

The autopsy photographs were admitted into evidence to establish the manner in which the victim was killed. Dr. Roffman testified that it was his expert opinion that the cause of death was a "stab wound in the mid chest which penetrated the heart." However, the cause and time of death is ultimately an issue of fact for the jury to determine. Paulson testified that when she fled her apartment to seek help, Oster was still fully clothed, sitting in the chair, and that she only saw a slash to Oster's throat. However, officers testified that when they entered the apartment, Oster's body was lying on the floor naked and mutilated.

McBride argues that his decision to kill Oster was made while he was angry and did not have normal self-control, and thus he could only be convicted of manslaughter and not first

or second degree murder. However, as stated, the evidence reveals that Oster's body was in a much different position and condition than when Paulson fled the apartment. The jury could have reasonably concluded that Oster was alive when Paulson fled the apartment and that McBride formed the requisite premeditated malice and killed Oster subsequent to that time. As a result, the photographs are clearly probative of the cause and time of death and, thus, probative of the issue of premeditated malice.

Furthermore, these photographs are not cumulative evidence. As stated, cumulative evidence means evidence tending to prove the same point to which other evidence has been offered. *State v. Toney*, 243 Neb. 237, 498 N.W.2d 544 (1993). The crime scene photographs were offered for a materially different reason (premeditated malice) than the autopsy photographs (expert opinion on manner of death) and thus did not tend to prove the same point for which the autopsy photographs were offered.

Thus, these photographs were not prejudicial to McBride. As this court has stated, "Gruesome crimes produce gruesome photographs." *State v. Ryan*, 226 Neb. 59, 81, 409 N.W.2d 579, 593 (1987). As a result, we conclude the district court did not abuse its discretion in admitting the crime scene photographs into evidence.

### 5. MOTION FOR DIRECTED VERDICT

McBride next alleges the district court erred in failing to grant his motion for a directed verdict of not guilty at the close of all evidence. More specifically, McBride argues that because his decision to kill Oster was made while he was angry and did not have normal self-control, he can only be convicted of manslaughter and not first or second degree murder.

In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994); *State v. Hirsch*, 245 Neb. 31,

511 N.W.2d 69 (1994). If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law. *State v. Hirsch, supra.*

The crime of first degree murder requires proof that the defendant killed purposely and with deliberate and premeditated malice. § 28-303(1). The intent to kill may be inferred, sufficient to support a murder conviction, from the defendant's deliberate use of a deadly weapon in a manner likely to cause death. *State v. Marks,* 248 Neb. 592, 537 N.W.2d 339 (1995). Deliberate means not suddenly, not rashly; but deliberation requires that the defendant considered the probable consequences of his or her act before doing the act. *Id.* One kills with premeditated malice if, before the act causing the death occurs, one has formed the intent or determined to kill the victim without legal justification. *Id.* The time required to establish premeditation may be of the shortest possible duration and may be so short that it is instantaneous, and the design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed. *Id.*

As stated, no evidence was adduced at trial whatsoever to indicate that a "sudden quarrel" of any kind took place between McBride and Oster. McBride sat watching television with Oster for approximately 15 minutes before attacking her and made incriminating statements during and after the attack. An eyewitness testified to the murder; the police recovered the murder weapon and apprehended McBride at the scene of the murder. McBride made statements that implicated himself as the perpetrator of the crime. We conclude that the properly admitted evidence overwhelmingly supports the jury's guilty verdict. As a result, McBride's assigned error is without merit.

### 6. MOTION FOR NEW TRIAL

McBride further alleges the district court erred in failing to grant his motion for new trial because the verdict entered was not supported by sufficient evidence. For the reasons stated above, we conclude that there was overwhelming evidence to

support the jury's findings and that, thus, the trial court did not abuse its discretion in denying McBride's motion for new trial. See, *State v. Richter*, 240 Neb. 913, 485 N.W.2d 201 (1992); *State v. Jensen*, 238 Neb. 801, 472 N.W.2d 423 (1991).

### 7. JURY INSTRUCTIONS

McBride next alleges the district court erred in refusing instructions which were offered by him. To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Derry*, 248 Neb. 260, 534 N.W.2d 302 (1995). It is not error for a trial court to refuse to give a defendant's requested instruction where the substance of the requested instruction was covered in the instructions given. *State v. Neujahr*, 248 Neb. 965, 540 N.W.2d 566 (1995).

One of the challenged instructions was instruction No. 11, which defined sudden quarrel. The court elected to give its own instruction rather than the one offered by McBride. McBride does not argue how he was prejudiced by the court's refusal to give his instruction and, thus, failed to meet his burden. See *State v. Derry, supra*. In any event, we determine that the substance of the requested instruction was covered in the instructions given.

The other contested instruction was instruction No. 10, which defined premeditation. The court once again elected to give its own instruction rather than the one offered by McBride. The definition of premeditation in McBride's proposed instruction is exactly that which is set forth in Neb. Rev. Stat. § 28-302(3) (Reissue 1995), while the district court's instruction adds the statement: "The time needed for premeditation may be so short as to be instantaneous provided that the intent to act is formed before the act and not simultaneous with the act." See *State v. Marks*, 248 Neb. 592, 537 N.W.2d 339 (1995).

McBride argues that this additional statement confused and misled the jury because it blurred the distinctions between first degree murder, second degree murder, and manslaughter. However, the instructions clearly and correctly stated the material elements of each of these crimes. The additional statement in the instruction given by the court merely stated a correct proposition of the law and did not blur the distinctions among these crimes.

While we find that McBride's tendered instruction was a correct statement of the law and warranted by the evidence, we conclude that McBride was not prejudiced by the district court's refusal to give his instruction because its substance was covered in the instruction given. As a result, we conclude that McBride's assigned error is without merit.

### 8. SENTENCE

Finally, McBride alleges the district court abused its discretion by imposing a sentence which was "excessive and disproportionate to the severity of the offense when considered with his background and prior record." The district court sentenced McBride to life in prison for the murder and a consecutive term of 19 to 20 years' imprisonment on the use of a weapon conviction.

In imposing a sentence, a sentencing judge should consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Ladig*, 248 Neb. 737, 539 N.W.2d 38 (1995); *State v. Derry, supra*. This crime was exceptionally brutal. McBride beat Oster, slit her throat, and mutilated her body. The sentences imposed were within statutory limits. As a result, we conclude the district court did not abuse its discretion.

### V. CONCLUSION

We conclude all of McBride's assigned errors are without merit. As a result, we affirm.

AFFIRMED.