STATE OF NEBRASKA, APPELLEE, V.
PATRICK A. CLARK, APPELLANT.
588 N.W. 2d 184

Filed January 22, 1999.    No. S-98-086.

Martin A. Cannon for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.

## NATURE OF CASE

Patrick A. Clark appeals his convictions for second degree murder and use of a firearm in the commission of a felony. We affirm.

## STATEMENT OF FACTS

The wounded body of Leroy Fowler was discovered in the parking lot of the Kingswood Apartments near 132d and West Center Road in Omaha shortly after noon on March 12, 1997. Fowler had been shot four times with a .22-caliber revolver. The parking lot in which the shooting occurred adjoins a busy strip-mall shopping center, and two witnesses saw Clark shoot Fowler, then run from the scene. Fowler was alive when police and rescue personnel arrived at the scene shortly after the shooting. He died the following day. Fowler was known to police and others as a dealer of illegal drugs.

Clark is a 42-year-old, divorced, unemployed carpenter addicted to methamphetamine. Clark had met Fowler 7 months prior to the shooting, in August 1996, in connection with a drug transaction. Clark began to buy methamphetamine regularly from Fowler, and his debt to Fowler rapidly increased. According to Clark, in late 1996, Fowler insisted that Clark work for him, apparently as security for the unpaid drug debt. In return for Fowler's "fronting" drugs to Clark without immediate payment, Clark worked for Fowler nearly every day without pay. Clark's debt to Fowler was not diminished by the services he provided to Fowler. The uncontroverted evidence showed that Fowler imposed usurious "interest" and that Clark's debt continued to increase.

Clark's jobs for Fowler included carpentry and cleaning at Fowler's home in North Omaha. Fowler's home was unusually fortified with security precautions, including video cameras mounted outside the house to provide constant surveillance of

the grounds. Clark also drove Fowler around Omaha two or three times per week to collect money from drug sales. Clark testified that Fowler often gave Clark Fowler's gun to carry as the two made these nighttime rounds to collect Fowler's drug money. Fowler could not lawfully carry a gun, since he was a convicted felon. Clark testified that Fowler used intimidation, threats, and violence to collect money due to him for illegal drug sales.

Clark testified that he was dependent on the methamphetamine he got from Fowler, but that he could not pay for it. Clark said he felt increasingly frightened by Fowler's intimidation of him, including threats to injure or kill Clark, his young children, and Clark's parents. It was uncontroverted that Fowler was a bigger, heavier person than Clark. Clark stated that he felt he could not challenge Fowler because Fowler supplied him with methamphetamine to feed his addiction and Clark believed that Fowler would follow through on his threats to harm Clark or Clark's family because of the unpaid drug debt.

In the week preceding the March 12, 1997, shooting, Clark testified that he had worked for Fowler continuously for nearly 3 days without a break, including moving a large cache of Fowler's weapons, ammunition, and drugs. The weapons included hand grenades and automatic weapons. Clark testified that at approximately 7 p.m. on Friday, March 7, after moving Fowler's cache to a storage unit, Clark told Fowler that he had to get some sleep. According to Clark, Fowler grudgingly agreed to a few hours, telling Clark, "You come down to my house at 10 o'clock or I'm going to chase you down." Clark went to his parents' home, where he lived, to sleep. Contrary to Fowler's instructions, Clark did not return to Fowler's home.

Clark avoided Fowler's attempts to reach him until the following Wednesday, March 12. Fowler arrived at the Clark home in a rage at approximately 8:40 a.m., soon after Clark had awakened. Joseph Clark, Clark's brother, encountered Fowler as Fowler arrived at the Clark home and Joseph Clark was leaving for work. Joseph Clark had never before met Fowler. Fowler gave Joseph Clark "a dirty, dirty glare — like he could beat somebody up."

Once inside the Clark home, Fowler demanded that Clark leave with him. He took many of Clark's possessions, including clothes, tools, and three houseplants, which were later found in the back of Fowler's car. Fowler did not expressly mention Clark's unpaid drug debt, but Clark testified, "I knew that's what this was about" and "I knew he was going to kill me and I knew he had the potential."

Clark testified that he believed that Fowler was carrying a gun underneath his jacket. Fowler threatened to blow up the home of Clark's parents, who were in the upper level of the house. Clark testified that he was very scared that Fowler, who looked "more wicked this time than ever," would carry through with his threat. Clark believed that he could not communicate with his parents to call police, so he agreed to leave with Fowler, to get him out of the house. Clark surreptitiously grabbed a .22-caliber revolver which he owned and slipped it into his pants before he left with Fowler.

Clark and Fowler left in Fowler's car, with Fowler driving. Clark said he knew a place in west Omaha where he could get $2,000 to pay Fowler. Clark testified that he was trying to direct Fowler to the Omaha police station in Millard. Fowler became increasingly suspicious and angry as they drove toward Millard. Clark testified that Fowler suddenly turned the car into a parking stall in the Kingswood Apartments parking lot, saying, "Bullshit. This is it."

Without fully stopping the car, Fowler leaped out of the driver's side. Clark testified that he was "petrified" and that he was sure that Fowler planned to come around the car and kill him. Clark jumped out of the car, pulled out his gun, and began firing at Fowler across the roof of the car. Clark saw Fowler go down and testified that he thought Fowler was ducking down to avoid the gunfire. Clark testified that when he saw Fowler go down, he ran from the scene, believing that he could outrun Fowler.

Clark took the gun with him when he ran. He buried it beneath a bush in a flowerbed at a house located several blocks away. He then walked to the Walgreen's drugstore in the nearby shopping center adjoining the Kingswood Apartments parking

lot, and he called a friend, Tonya Odell, to pick him up. Odell did so, returning Clark to his home between 2 and 3 p.m.

Meanwhile, rescue personnel took Fowler to St. Joseph Hospital for medical care. At the hospital, police interviewed Fowler's girl friend about the shooting, and she identified some of the personal property found in Fowler's car as belonging to Clark.

Police contacted Clark at his parents' home at approximately 12:25 a.m. on Thursday, March 13. Under questioning at police headquarters, Clark initially denied any involvement in the shooting of Fowler. When confronted with the identification of his property in Fowler's car, Clark began crying and confessed that he had shot Fowler. Police officers taped Clark's statement, which was played for the jury at trial. The officers to whom Clark gave his confession testified that Clark appeared nervous and afraid and that he told them that he was scared of Fowler. The officers testified that they believed Clark told them the truth and that they found him cooperative. The officers testified that the information which Clark gave them regarding the location of the gun used in the shooting, as well as Fowler's cache of weapons and drugs, was accurate.

Clark was charged with first degree murder and use of a firearm in the commission of a felony. He testified in his own defense at trial. Clark maintained that he shot Fowler in self-defense and that he did not intend to kill Fowler. In addition to the facts set forth above, Clark stated that Fowler's behavior had become increasingly erratic and violent in the weeks preceding the shooting and that Fowler had physically beat him on several occasions.

At trial, the prosecution introduced the testimony of Jerry W. Jones, M.D., a forensic pathologist who performed an autopsy upon Fowler. Jones stated that Fowler was shot twice on the left side of his chest, once in his lower right abdomen, and once on the left side of the back of his head. Jones opined that the head wound caused Fowler's death. The other gunshot wounds were nonfatal. Jones concluded that the shots which wounded Fowler were fired from a distance of 24 inches or more at Fowler. Toxicology tests revealed the presence of cocaine and methamphetamine in Fowler's body at the time of his death. There was

evidence that the amount of methamphetamine in Fowler's body was five times greater than any amount which would conceivably be prescribed for a therapeutic purpose and that at such a concentration, the methamphetamine could have caused Fowler to be anxious, restless, and delusional. Additional trial evidence is discussed below as needed.

The jury was instructed regarding first degree murder, second degree murder, manslaughter, and self-defense. The jury found Clark guilty of second degree murder and use of a firearm in the commission of a felony. Clark was sentenced to life imprisonment on the murder conviction, and a consecutive term of 10 years' imprisonment on the use conviction. He appeals.

## ASSIGNMENTS OF ERROR

Clark claims that the trial court erred in admitting a photograph of Fowler and his daughters over Clark's objection. Clark asserts that the trial court erred in failing to sustain his motions to dismiss made at the close of the State's evidence and at the close of all the evidence, and in failing to grant his motion for a new trial. Clark assigns as error the trial court's exclusion of evidence which he offered to prove Fowler's violent disposition. Clark also claims that he received an excessive sentence.

## STANDARD OF REVIEW

In proceedings where Nebraska statutes involving the rules of evidence apply, the admission of evidence is controlled by rule and not by judicial discretion, except where judicial discretion is a factor involved in assessing admissibility. *State v. Nissen*, 252 Neb. 51, 560 N.W.2d 157 (1997).

In determining whether a criminal defendant's motion to dismiss for insufficient evidence should be sustained, the State is entitled to have all of its relevant evidence accepted as true, the benefit of every inference that reasonably can be drawn from the evidence, and every controverted fact resolved in its favor. *State v. Jackson*, 255 Neb. 68, 582 N.W.2d 317 (1998).

In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Kula*, 252 Neb. 471, 562 N.W.2d 717 (1997).

## ANALYSIS

*Admission of Photograph.*

Clark objected to the admission of a photograph of Fowler and his daughters and argues on appeal that the receipt into evidence of this photograph was reversible error. Although we conclude that the admission of the photograph was error, we find its admission to be harmless error.

The admission of photographs into evidence rests largely within the discretion of the trial court, which must determine their relevancy and weigh their probative value against their possible prejudicial effect. *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996). This is particularly so where the photographs are gruesome or explicit. *Id.* In a homicide prosecution, photographs of a victim may be received into evidence for purposes of identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent. *Id.* See, also, *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993).

In the instant case, the photograph of Fowler and his daughters was not offered for a proper purpose and its relevance is imperceptible. The admission of the photograph was error.

The erroneous admission of evidence in a criminal trial is not prejudicial if it can be said that the error was harmless beyond a reasonable doubt. *McBride, supra.* In the instant case, the photograph is small, the images in the photo are blurred, and the facial features of Fowler and his daughters are scarcely distinguishable. The photograph appears to have been taken with a Polaroid-type camera. The impact of the photograph is innocuous.

Having reviewed the record as a whole, we determine that the evidence properly admitted overwhelmingly establishes Clark's guilt beyond a reasonable doubt. We, therefore, conclude that error in admitting the photograph did not materially influence the jury in reaching its verdict and was harmless beyond a reasonable doubt. The assigned error is without merit.

*Denial of Motions to Dismiss Charges and Motion for New Trial.*

Clark testified that he shot Fowler in self-defense and that he did not intend to kill Fowler. Clark moved to dismiss the

charges at the end of the State's presentation of evidence and at the conclusion of all the evidence, claiming that the State had failed to prove his intent, a material element of the crime with which he was charged. This was also the basis of Clark's motion for new trial.

In determining whether a criminal defendant's motion to dismiss for insufficient evidence should be sustained, the State is entitled to have all of its relevant evidence accepted as true, the benefit of every inference that reasonably can be drawn from the evidence, and every controverted fact resolved in its favor. *State v. Jackson*, 255 Neb. 68, 582 N.W.2d 317 (1998). A motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Kula*, 252 Neb. 471, 562 N.W.2d 717 (1997). We have reviewed the trial proceedings, and we conclude that the trial court properly denied Clark's motions to dismiss the charges and his motion for new trial.

With respect to Clark's claim that the record lacks evidence of intent, we note that Clark's denial of his intent to kill Fowler was not the sole evidence of intent offered at trial. A criminal defendant's mental process of forming the intent to kill is not always susceptible to proof by direct evidence, and it may be proved by circumstantial evidence. *State v. Lyle*, 245 Neb. 354, 513 N.W.2d 293 (1994). For example, in *Lyle*, a first-degree murder case, this court found that Lyle's act of intentionally aiming the gun up and down the victim's body as the gun was fired could reasonably be interpreted as circumstantial evidence of Lyle's intent to kill.

In the instant case, eyewitnesses testified that they saw and heard Clark fire multiple shots, even as Fowler was falling to the ground. This and other evidence could reasonably be found to be circumstantial evidence of Clark's intent to kill Fowler. The interpretation of the evidence was a matter of fact which precluded a directed verdict against the State and which was properly left to the jury to determine. The trial court did not err in overruling Clark's motions to dismiss and the motion for new trial on this basis. These assigned errors are without merit.

1014

*Exclusion of Larsen Testimony.*

Clark unsuccessfully attempted at trial to introduce the testimony of Robert Larsen, an agent of the State of Iowa's division of criminal investigations. Larsen is assigned to patrol the Ameristar Casino in Council Bluffs, Iowa. The State's objection to Larsen's testimony was sustained, and Clark made an offer of proof outside the presence of the jury.

If allowed to testify, Larsen would have stated that he arrested a drug dealer named Arthur Hernandez at the casino on January 27, 1997. According to Larsen, Hernandez was "paranoid" and feared for his life when he approached Larsen. Hernandez told Larsen that some drug deals he made with Fowler had gone awry and that Fowler had contracted with others to murder Hernandez. Hernandez gave Larsen methamphetamine which Hernandez possessed, in order to be arrested and gain safety from Fowler. Larsen stated that he had never before encountered such a situation and that on the basis of this encounter, he formed an opinion that Fowler possessed violent propensities because "I don't know why else anybody [such as Hernandez] would hand over drugs so blatantly to a police officer."

The trial court rejected Larsen's testimony on the bases that it was hearsay and that Larsen's opinion was not based upon sufficient foundation. The trial court's ruling was correct.

In the instant case, on the record before us, Clark's trial counsel tendered his offer of Larsen's testimony as lay opinion evidence. Clark proffered no evidence that Larsen had or acquired knowledge about Fowler's tendencies other than that conveyed by Hernandez, which served as the basis for his opinion that Fowler possessed violent propensities. Larsen did not investigate the veracity of Hernandez' assertions. Opinion evidence which is unsupported by appropriate foundation is not admissible. *Menkens v. Finley*, 251 Neb. 84, 555 N.W.2d 47 (1996). On this record, the trial court correctly excluded Larsen's testimony as lacking foundation.

In excluding the proposed testimony of Larsen, the trial court correctly noted that Hernandez' statements made to Larsen were hearsay and therefore excluded. Hearsay is defined as a statement other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the

matter asserted. *State v. Neujahr*, 248 Neb. 965, 540 N.W.2d 566 (1995). The record fails to show that Hernandez' statements to Larsen were otherwise admissible under any exception to the hearsay rule. We, therefore, conclude that the proffered testimony was properly excluded and that this assignment of error is without merit.

Clark contends that he received an excessive sentence. Clark was sentenced to life imprisonment for the second degree murder conviction, plus a consecutive term of 10 years' imprisonment on the use of a firearm conviction.

We have stated that a sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Chojolan*, 253 Neb. 591, 571 N.W.2d 621 (1997). An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result. *Id.* We have carefully reviewed the trial evidence, and on this record, we find no abuse of discretion.

## CONCLUSION
For the reasons set forth above, we affirm.

AFFIRMED.